THE ARDBERN COMPANY, LIMITED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90881.   Promulgated April 23, 1940.

*J. Sterling Halstead, Esq.,* for the petitioner.
*W. Frank Gibbs, Esq.,* for the respondent.

912

OPINION.

HILL: Respondent originally asserted for the year 1929 the fraud penalty provided in section 293 (b) of the Revenue Act of 1928, but on brief he concedes that the evidence fails to show that any part of the deficiency for that year is due to fraud with intent to evade tax and admits that he was in error in proposing such fraud penalty. On this issue, therefore, we find for petitioner.

Of the issues presented for decision, we shall first consider issue (2), since it raises a question of limitations, which, if sustained, would be a bar to recovery of any of the deficiencies in controversy. Petitioner asserts that assessment and collection of the deficiencies are barred by the provisions of section 275 (c) of the Revenue Acts of 1928 and 1932, quoted in the margin.[1] Petitioner points to the fact that Feustman, its sole stockholder, reported in his individual income tax returns dividends from petitioner for 1929 of $4,000, for 1930 of $13,500, and for 1931 of $6,000, and argues that this brings the case at least in substance within the purpose and language of section 275 (c). But the above amounts which Feustman so reported were only the amounts actually distributed to him in the years named and were not the full amounts of petitioner's distributable income for those years. The facts found herein show that even on the basis of Feustman's returns and of petitioner's contention as to amounts of its distributable income Feustman failed to

[1] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

(c) CORPORATION AND SHAREHOLDER.—If a corporation makes no return of the tax imposed by this title, but each of the shareholders includes in his return his distributive share of the net income of the corporation, then the tax of the corporation shall be assessed within four years after the last date on which any such shareholder's return was filed.

report $1,274.29, $2,603.09, and $1,303.76 of such distributable income, respectively, for the years 1929, 1930, and 1931. This fact indicates that Feustman was not reporting under section 275 (c). Accordingly, we hold that such section does not apply.

Petitioner's plea of limitation must in any event fail for lack of proof of the dates on which the shareholder's returns were filed for the respective years. Feustman made no attempt to fix such dates in his testimony, nor are the dates of either execution or filing shown on the copies of the returns introduced in evidence. In the absence of such proof, we can not say that the notice of deficiency for any of the taxable years was not mailed within four years after the date on which the shareholder's return was filed. Where there is no proof of the date of filing of the return, this Board will not hold that a deficiency is barred. *M. A. Nicholson*, 22 B. T. A. 744; *Mary G. Iba*, 20 B. T. A. 222; *Fremont Canning Co.*, 17 B. T. A. 484.

Issue (1) raises the question of petitioner's right to the benefit of deductions in computing its taxable income, under the circumstances set out in our findings of fact above. Respondent determined the deficiencies on the basis of gross income, and contends that petitioner is not entitled to the allowance of any deductions because the facts do not bring it within the limitations prescribed in section 233 of the Revenue Acts of 1928 and 1932.[2] Petitioner argues that the returns prepared on form 1120 and lodged with conferee Marsh of the Bureau of Internal Revenue in Washington on November 12, 1937, or the returns filed with the collector at Baltimore, Maryland, on October 28, 1938, constituted substantial compliance with the statute so as to entitle it to the benefit of the deductions now claimed. If the returns filed meet the requirements of the statute, the parties are in agreement as to the amounts of the deductions allowable, and respondent admits that in such event the deductions allowable for each of the taxable years exceed gross income, with the exception of the year 1929. Even if petitioner's contentions be conceded, it still appears that it had taxable net income for 1929 in an amount not less than $10,740.48.

The alleged returns prepared for petitioner on form 1120 and verified in Cuba by Feustman on June 7, 1937, were during the same month attempted to be filed with conferee Muller in New York, but Muller refused to accept them. Petitioner argues that such refusal was wrongful. However, these same forms were later, in November

---

[2] SEC. 233. ALLOWANCE OF DEDUCTIONS AND CREDITS.

A foreign corporation shall receive the benefit of the deductions and credits allowed to it in this title only by filing or causing to be filed with the collector a true and accurate return of its total income received from all sources in the United States, in the manner prescribed in this title; including therein all the information which the Commissioner may deem necessary for the calculation of such deductions and credits.

1937, tendered to and received by Marsh, an employee of the Bureau in Washington, conditioned upon a settlement of the case.

In support of its contention that returns may properly be filed by a taxpayer with the Commissioner, or subordinate employee of the Bureau of Internal Revenue, other than a collector, petitioner cites and quotes at length from an unreported opinion of this Board entered April 13, 1939, in *American Investment & General Trust Co., Ltd.*, Docket No. 85714. It is obvious from petitioner's quotation from such opinion that the cited case is distinguishable on the facts. There it was contended that no returns had been filed, but it affirmatively appeared that returns had been filed, since the deficiencies were determined upon the basis of information contained in *returns accepted by the Bureau*. The deficiencies in the present proceeding had been finally determined by respondent on the basis of a *revenue agent's report*, the deficiency notice mailed to petitioner, and the petition filed with the Board prior to the date on which petitioner's first set of returns were tendered to and conditionally received by conferee Marsh in Washington. The cited decision does not support petitioner's present contention.

Section 52 (a) of the applicable revenue acts provides that every corporation subject to the income tax shall make a return, and section 53 (b) (2) provides that returns of corporations shall be made to the *collector* of the district in which is located the principal place of business or principal office or agency of the corporation, or, if it has no principal place of business or principal office or agency in the United States, then to the *collector at Baltimore, Maryland*. Also, section 233, *supra*, it will be noted, requires a foreign corporation to file its return with the *collector* in order to receive the benefit of deductions. There is no statutory authority for the making or filing of a return with the Commissioner of Internal Revenue, nor is it his duty or the duty of any conferee or employee of the Bureau, other than the collector designated in the statute, to accept returns. This question was considered by us in *W. H. Hill Co.*, 23 B. T. A. 605; affd., 64 Fed. (2d) 506; certiorari denied, 290 U. S. 691, where we said at page 607:

Petitioner contends that a return for this fiscal year was executed by the officers of the petitioner and delivered to the revenue agent at his request; that he promised to file the return, and that the execution and lodgment of the return with the revenue agent meets the requirements of the statute. There is no merit in this contention. * * * It is no part of the duties of an internal revenue agent or of an internal revenue agent in charge to file returns for taxpayers. That is the duty which law places on the shoulders of the taxpayers.

Petitioner did not, by the lodgment of returns with conferee Marsh, discharge the duty which the statute laid upon it. Also, the action of petitioner in filing returns with the collector at Baltimore on Octo-

ber 28, 1938, was ineffective to bring it within the limitations of the statute so as to entitle it to the benefit of deductions. These returns were filed (a) after respondent had determined the deficiencies and prepared returns for petitioner under section 3176 of the Revised Statutes, as amended, and (b) after the petition and answer had been filed and the case was at issue before the Board, and only approximately two and one-half months prior to the hearing. Returns filed under such circumstances do not meet the requirements of section 233. *Taylor Securities, Inc.*, 40 B. T. A. 696. On the point under discussion, the facts of the instant proceeding are not distinguishable in any material respect from those of the *Taylor* case. On authority of that decision and for the reasons therein stated, which need not be repeated here, respondent's action in computing the present deficiencies without the allowance of deductions is approved.

The third issue is whether or not profit derived by petitioner from the sale in 1929 of 586 shares of Bank of America stock is subject to the United States income tax. Respondent determined, as stated in the deficiency notice, that petitioner sold 586 shares of Bank of America stock on May 27, 1929, and realized therefrom a profit of $63,093.06; also that petitioner sold 83 shares of stock of the same bank on September 19, 1929, at a profit of $13,712.43. The profit from both transactions, in the aggregate amount of $76,805.49, respondent included in gross income in determining the deficiency for 1929. Petitioner assigns no error in respect of respondent's action in taxing the profit on the sale of the 83 shares, nor does petitioner raise any question concerning the *amount* of the gain derived from the sale of the 586 shares, but alleges that the latter sale was made in Montreal, Canada. Hence, petitioner argues that the profit sought to be taxed to it by respondent was derived by a foreign corporation from the sale of property in a foreign country and is not subject to United States income tax. The sole question, then, is whether or not this sale was consummated in Canada, as petitioner avers, or whether it was in fact made in New York, as respondent contends.

The record does not disclose a very clear picture of the transaction in controversy. We have difficulty in ascertaining precisely what transpired in that connection. Feustman, president of petitioner corporation, testified in part as follows:

Q. Who was it, then, who approached the Ardbern Company, or you as president of that company, in connection with the sale of any part of the Bank of America stock, of the 4,251 shares?

A. I can not answer because I do not remember which one of the officers of Blair & Company came to me; but one of them did, I presume, and told me of a plan to sell certain amounts of stock by various stockholders in order to provide, at a special price, stock for some of the percentage men in the old firm of Blair & Company. * * *

Q. Then give me the details of how Ardbern Company sold a part of its stock of the Bank of America. * * *

A. At sometime after the merger, one of the senior officers of Blair & Company came to me and asked me whether my company would not sell a certain number of shares of stock at a price far below the market in order to provide some stock for certain other people to purchase, and I said yes, I would do it.

Q. Was that person a member of this committee that was formed?

A. I do not know. I presume so, but I can not say yes. * * *

Q. And after you gave your consent to it, what happened?

A. I presume that after I gave my consent the stock was sold. * * *

Q. What part did you, as a representative of Ardbern Company, have to do with the sale of this stock?

A. Nothing. * * *

Q. Did you authorize Mr. Crooks to take the certificates up to Montreal and sell them there?

A. I personally did not, no.

Q. What other officer or employee of Ardbern Company authorized Mr. Crooks to take the certificates up to Montreal?

A. I presume the one who authorized him to was the person to whom I had agreed to sell the stock.

Feustman further testified that while he had no personal knowledge of the matter, he understood that the 586 shares sold by his company, the certificates of which were in the possession of the Bancamerica-Blair Corporation, were sent by a messenger, one Crooks, an employee of that corporation, to Montreal, Canada, where they were sold to the Bank of Montreal, which paid petitioner corporation by check or draft deposited to its credit in the Canadian Bank of Commerce; he did not know who purchased the stock owned by the Ardbern Co.; it was not handled as an individual transaction, but as a part of a composite sale that involved "a lot of money and other shares of stock." Prior to this transaction, the certificates representing the shares of stock owned by petitioner had been handed to Feustman for endorsement.

Crooks testified that on May 25, 1929, he received from the securities clerk of the Bancamerica-Blair Corporation certificates representing more than 15,000 shares of Bank of America stock (including the 586 shares owned by petitioner), and was instructed by a member of the stockholders' committee or by the treasurer of Blair & Co. to take the certificates to Montreal, Canada, for the purpose of making a sale of stock at that place. Prior to his departure Crooks had no discussion with Feustman regarding the matter, and made no report to him on his return. What Crooks did in Montreal, as related in his testimony, we have summarized in our findings of fact above. It is not shown that Crooks had any authority to make a sale but was merely the messenger who carried the stock certificates to Montreal. Prior to Crooks' departure, the sum of $2,120,950 was deposited with

the New York agency of the Bank of Montreal, and a corresponding credit was wired to the Canadian Bank of Commerce, which distributed the money, upon Crooks' arrival with the stock certificates, in accordance with instructions contained in a letter from the treasurer of the Bancamerica-Blair Corporation. In accordance with those instructions, $1,568,360 was wired back to New York for use of the Bancamerica-Blair Corporation two days later, on Monday, May 27.

While the details of the transaction are not clear, as before pointed out, it does reasonably appear, we think, that nothing was done in Canada which could be construed as constituting a sale of the stock involved in this case. Petitioner's stock certificates were endorsed in blank by Feustman, as president, and delivered in New York to the committee or other person representing the purchaser or purchasers. Neither Feustman nor any other officer of petitioner authorized or directed any one to take the stock certificates to Montreal, Canada, for sale.

No negotiations between the parties were carried on in Canada; no contract of purchase or sale was entered into there; neither purchaser nor seller was present in person or represented by an agent in Montreal, unless Crooks or the Bank of Montreal could be so designated, and certainly the record does not indicate that either had any authority to represent any one in connection with the making of the sale of stock in controversy. Crooks merely took the stock certificates to Montreal and turned them over to the bank. The bank performed purely clerical functions in accordance with the detailed instructions contained in the letter from the treasurer of the Bancamerica-Blair Corporation.

Whatever was done to constitute a purchase on the one hand and a sale on the other obviously was done in New York. Prior to the departure of Crooks for Montreal, all negotiations had been concluded and the contract of purchase and sale assented to by all interested parties; the stock certificates were in "street names" in the possession of the Bancamerica-Blair Corporation; they were endorsed in blank, so that physical delivery would constitute transfer of title, and the money consideration to be paid for the stock was likewise then in the possession of the same corporation, having been taken out of credits to the account of the percentage men. Many of the percentage men, who were the purchasers, lived in and near New York City. So far as they were involved, therefore, the money which they had paid and the stock certificates which they were to receive therefor were merely sent up to Canada, the money returned immediately for delivery to the sellers and the certificates returned for delivery to the purchasers. In fact, of the

$2,120,950 wired to Montreal on May 25, more than a million and a half dollars was returned for use of the Bancamerica-Blair Corporation on May 27, apparently for payment over to certain of the sellers. This, in our opinion, did not constitute a sale in Canada. As to petitioner, it does not appear specifically what disposition was made of the certificates of stock owned by it, but the amount of the selling price was placed to its credit in the Canadian Bank of Commerce on May 27 and withdrawn by check four days later, on May 31.

After an agreement of purchase and sale has been entered into and to complete the transaction there remains only an exchange to be made of the property for the consideration, the sale can not be said to be made at another place merely because such exchange is consummated there. The sale is made at the place "where the final act of the seller, causing title to pass, was done." *East Coast Oil Co.*, *S. A.*, 31 B. T. A. 558; affd., 85 Fed. (2d) 322; certiorari denied, 299 U. S. 608. Any other conclusion would be to regard form rather than substance, to "elevate artifice above reality."

"It is well established that title to property passes at the place of sale where the final act of the seller making effective the sale takes place." *Hazleton Corporation*, 36 B. T. A. 908, 923, and authorities cited. When Feustman, as president of petitioner corporation, endorsed the stock certificates in blank and delivered them to the agent of the purchasers in New York, it not being shown that it was intended that title thereto should pass at some other time or place, nothing further remained to be done by the seller, petitioner herein, to make the sale effective in accordance with Feustman's agreement. Petitioner was thereupon entitled to receive the consideration agreed upon. There is nothing in the record to indicate that Feustman had agreed that the sale should be consummated in Canada, or that the transaction there was at his request or for the benefit of his company. Obviously, of course, he must have designated the Canadian Bank of Commerce as a depositary of the money to be paid for the stock, but he testified that neither he nor any other officer of petitioner corporation authorized Crooks to take the certificates to Montreal and sell them, but that such proceeding, he presumed, was authorized by the person to whom he had agreed to sell the stock. Feustman testified that after he endorsed and delivered the certificates in New York he had nothing further to do with the transaction.

Petitioner cites and relies principally upon the *East Coast Oil Co.* and *Hazleton Corporation* decisions, *supra*. The factual situations in those cases distinguish them from the present proceedings. In the *Hazleton* case, while the taxpayer corporation negotiated the sale of its stock to the bankers in San Francisco, it was clearly understood

that the sale was to take place in Canada and not in the United States. The agreement to sell was specifically predicated upon that condition. The stock certificates were then in Canada, on deposit with the Bank of Montreal. The bankers appointed the Royal Trust Co. of Montreal their agent for the purchase of the stock. On the facts presented, we reached the conclusion that the sale was consummated in Canada for the reason that it was the intention of all parties concerned that the seller should part with its title in the stock by delivery of the shares to the Royal Trust Co. in Montreal. No such facts appear in the instant case.

In *East Coast Oil Co., S. A., supra*, the taxpayer was a corporation organized under the laws of Mexico, dealing in crude petroleum and having agents in the United States for negotiation of sales. The profits sought to be taxed arose from sales of oil to parties in the United States through agents of the company, under contracts for future delivery, payments to be made to such agents in the United States after delivery. Some of the contracts provided for delivery f.o.b. and others for delivery c.i.f. Under either form of contract, title to the oil passed from seller to buyer on delivery of the oil to the ocean carriers at the company's docks in Mexico. In affirming our decision that the profits derived from such sales were not subject to the United States income tax, the Circuit Court of Appeals said:

In this case the important question is when and where were the profits earned. The company is a Mexican corporation, necessarily domiciled in that country. The property sold was produced in Mexico. The contract provided for firm sales. No profit resulted from the mere execution of the contracts. The oil was delivered to the buyer in Mexico. The title passed to the buyer in Mexico. When title passed the profit was earned in Mexico. Collection of the price in the United States was merely incidental and did not earn the profit.

In the instant case, since petitioner, acting through its president Feustman, endorsed its stock certificates in blank and delivered them to the agent of the purchasers in New York and it is shown that petitioner did not authorize any one to take the certificates to Canada for sale or delivery to the purchasers, we hold that the sale was made in New York, and that the profit derived therefrom is subject to the United States income tax. Collection of the price in Canada "was merely incidental and did not earn the profit." On this issue, respondent's determination is approved.

Issue (4) involves the question of whether or not petitioner received taxable gain from distributions made to it in 1932 by the Suffolk Corporation of Delaware or by the Suffolk Co., Ltd., a Newfoundland corporation. In computing the deficiency for 1932, respondent included in petitioner's gross income "distribution from Suffolk Corporation $49,340.84." Petitioner alleges that respondent erred "in

determining that the taxpayer received a taxable distribution from the Suffolk Corporation during the year 1932 amounting to $49,340.84, or a taxable distribution in any amount."

Petitioner contends that, since the Suffolk Corporation transferred substantially all of its assets to the Suffolk Co., Ltd., in exchange for all the latter's stock, this was a reorganization within the meaning of clause (B) of section 112 (i) (1) of the Revenue Act of 1928,[3] and, since the Suffolk Corporation immediately distributed to its shareholders, in pursuance of the plan of reorganization, all of the Suffolk Co.'s stock without the surrender by its shareholders of their stock in the Suffolk Corporation, no gain to the distributees is recognizable under the provision of section 112 (g) of the 1928 Act.[4]

Respondent takes the position that the transaction did not constitute a reorganization under the doctrine of *Gregory* v. *Helvering*, 293 U. S. 465, but further contends, in the alternative, that, even if it should be held to be a reorganization, petitioner would still remain subject to tax on gain from distributions made to it during 1932 by the Suffolk Co., Ltd., in an amount equal to that determined by respondent. The latter contention is based on the provisions of section 119 of the Revenue Act of 1932, to which further reference will be made.

While the deficiency notice alleges that petitioner received taxable gain in the amount included therein in income *from Suffolk Corporation of Delaware*, respondent says that the pleadings are broad enough to include a distribution of that amount from any source, and on this point petitioner does not object to the sufficiency of the pleadings. It should also be noted that petitioner on brief raises no question as to the *amount* of the distribution taxable to it, if it should be held to have received a *taxable* distribution during 1932.

In connection with the consolidation of the Blair companies with the Bank of America in 1929, the Suffolk Corporation of Delaware was organized for the ostensible purpose of liquidating such of the Blair assets as were not taken over by the Bank or its subsidiary. Undoubtedly one of the purposes of the organizers of the Suffolk Corporation was to have it effect such liquidation, but the conclusion

---

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

    *        *        *        *        *        *        *

  (i) DEFINITION OF REORGANIZATION.—As used in this section and sections 113 and 115—

  (1) The term "reorganization" means * * * (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred * * *

[4] (g) DISTRIBUTION OF STOCK ON REORGANIZATION.—If there is distributed, in pursuance of a plan of reorganization, to a shareholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corporation, no gain to the distributee from the receipt of such stock or securities shall be recognized.

is inescapable from a consideration of the whole record that that was not the sole actuating motive.

Shortly after the formation of the Suffolk Corporation in 1929, it proceeded to make cash "loans" to its stockholders at the rate of $20 per share, taking interest-bearing promissory notes of the stockholders therefor. Petitioner owned 3,250 shares of Suffolk Corporation stock and received a "loan" in the amount of $65,000. Since the Suffolk Corporation's capital stock consisted of 205,853 shares, it must have distributed more than four million dollars among its stockholders in the form of so-called loans. The source from which the corporation obtained this money, like many other pertinent and material facts, the record does not directly disclose; however, since these "loans" were made to the stockholders shortly after the formation of the Suffolk Corporation, the assumption would seem to be justified that it had received the funds, along with other assets, either from Blair & Co., the partnership, or from Blair & Co., Inc., or both. Obviously, the new corporation had not had sufficient time to realize such a large sum of money from the liquidation of assets.

At any rate, late in 1931 or early in 1932 the directors of the Suffolk Corporation decided to declare a dividend payable in the notes of the stockholders then held by it, but it developed that, because of the insolvency of some of the stockholders and the pledging of their stock as collateral security for loans, this could not be done under the laws of any state of the United States. Upon consultation with an attorney in New York, it was ascertained that a corporation organized in Newfoundland could declare a dividend payable in stockholders' notes, or offset the notes against dividend payments in the circumstances involved. Accordingly, in February 1932, the Suffolk Corporation of Delaware caused the Suffolk Co., Ltd., to be organized under the laws of Newfoundland, and the former corporation transferred substantially all of its assets to the latter company in exchange for all its capital stock. Thereafter, on February 20, 1932, the Suffolk Co., Ltd., declared a dividend of $2,100 per share, which was paid in notes and cash, and in July of the same year declared another dividend of $175 per share, which was paid in cash.

As a result of these transactions, the large accumulation of cash which the old Blair concerns apparently transferred to the Suffolk Corporation, along with other assets to be liquidated, was finally distributed to the old Blair stockholders in their capacity as Suffolk stockholders, and, at least so far as the present petitioner is concerned, if its contentions be sustained, it has received its proportionate part of such cash without the payment of any tax thereon.

The facts established by the evidence immediately suggest a number of questions, definite answers to which it is difficult to find in the record. Why did not the Blair firm distribute the accumulated cash to its stockholders at or prior to the consolidation? If it had done so, the stockholders would have had to pay a tax on their dividends, but, by transferring the funds to Suffolk of Delaware and causing that corporation immediately to distribute the money among the stockholders as "loans", no tax liability was incurred. Whatever may have been the motive for the so-called Suffolk reorganization, we think the evidence does not indicate that it was for the purpose of reorganizing the corporate business. It is well settled that if a transaction is such as to constitute a reorganization in reality, it is to be treated as nonetheless effective because of a motive to decrease or avoid taxes. But if every element required by the quoted statute is to be found in what was done, the transaction does not constitute a statutory reorganization unless it is a reorganization of the corporate business; "a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either" is not a reorganization within the meaning of the taxing statute, whether the motive relates to taxation or anything else other than a business or corporate purpose. *Gregory* v. *Helvering, supra.*

Petitioner suggests in its brief that the purpose of the alleged reorganization was to put the Suffolk Corporation on a basis which would be fair to all of its stockholders; that, because some of the stockholders had become insolvent and pledged their stock, the impossibility of collecting upon their notes would result in a relative loss to stockholders who were able to pay. But another result achieved by the transfer of the Suffolk Corporation's assets to the Newfoundland company was to diminish or perhaps absolutely destroy the value of the collateral pledged by the insolvent stockholders to secure loans made by their creditors in good faith. Neither such a result nor the purpose suggested by petitioner, we think, had any reasonable relation to the business of either corporation, and therefore did not constitute a reorganization within the meaning of the tax act. Cf. *Robert M. Morgan,* 41 B. T. A. 379.

We need not, however, rest our decision of this issue solely on the conclusion that the transaction was not a reorganization. Section 119 (a) (2) (B) of the Revenue Act of 1932 provides that an amount received as dividends from a foreign corporation shall be treated as income from sources within the United States unless less than 50 per centum of the gross income of such foreign corporation was derived from sources within the United States. It is not shown in the instant case what percentage of the gross income of the Suffolk

Co., Ltd., was derived from United States sources, and hence the dividends received by petitioner from that corporation in 1932, to the extent determined by respondent, must be treated as income subject to United States income tax.

The petitioner strenuously objects to such holding on the ground that, since the deficiency notice said nothing with respect to any distribution from the Suffolk Co., Ltd., it was respondent's burden to prove that the distributions in controversy come within the provisions of section 119, and, there being no proof on this point, respondent can not prevail. In support of this contention, petitioner cites *Tex-Penn Oil Co.* v. *Commissioner*, 83 Fed. (2d) 518; affd., 300 U. S. 481, which is based upon *Helvering* v. *Taylor*, 293 U. S. 507. Both of those decisions rest upon an affirmative showing that the tax determination of respondent was arbitrary and excessive. No such showing is made in the case at bar. The burden here is upon petitioner to show in the first instance that respondent's determination is erroneous. See authorities cited in the *Taylor* case, *supra*. Nor may we disapprove the deficiency determined by respondent in the absence of any evidence that the deficiency is erroneous in amount, even if it is shown to be based upon an erroneous principle. *Houston Lighting & Power Co.*, 34 B. T. A. 745, 750; *J. R. Raible Co.*, 18 B. T. A. 1140, 1142; *American Bond & Mortgage Co.*, 15 B. T. A. 264. If petitioner in fact received taxable income as determined by respondent, it is not our duty to aid it to escape the tax thereon merely because respondent, from the information before him at the time of his determination, erroneously concluded that the amount was received from the Suffolk Corporation instead of the Suffolk Co., Ltd. *John I. Chipley*, 25 B. T. A. 1103, 1106.

On the fourth issue, respondent's action is approved.

The remaining issue is whether or not respondent has properly held petitioner liable for delinquency penalties because of its failure to make and file income tax returns for the taxable years within the time prescribed by law. Section 291 of the Revenue Acts of 1928 and 1932 provides that, in case of a failure to make and file a required return within the time prescribed by law, 25 per centum of the tax shall be added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not to willful neglect, no such addition shall be made to the tax.

The duty imposed upon every taxpayer to make and file a timely return in accordance with the provisions of the revenue acts is not a matter of unimportance, and can be disregarded by a taxpayer only at his peril. Every taxpayer is in the first instance his own assessor, and it is his responsibility not only to file a return, but to make a *full revelation and fair return* of all taxable income, and to deal

frankly and honestly with the Government. *Charles E. Mitchell,* 32 B. T. A. 1093, 1128. Petitioner in this case did neither.

All of petitioner's capital stock was owned by Feustman, its president; it was, during the taxable years, his personal holding corporation. Yet, so far as disclosed by the record, Feustman evidenced no interest in the matter of its tax liability. His attitude was that of complete and utter indifference. It is not shown that he even consulted the attorney whom he employed to organize the corporation, who acted as its vice president. Some four years after the return for the last taxable year was due, and after a letter had been received from the Commissioner proposing to assess tax deficiencies, the first steps were taken looking to the filing of the required income tax returns. Even then, petitioner did not make a fair revelation, nor indeed any revelation, of the facts surrounding the transactions herein held to have produced taxable income, but decided all questions of tax liability in favor of his corporation. It was more than a year and four months after the first set of returns were prepared and verified by Feustman in Cuba before petitioner took the trouble to ascertain where and with whom the returns should be filed.

The only excuse offered by Feustman in his testimony for the failure to file returns within the time required by law was that he thought the corporation had sustained losses and there was no tax due. He thought that the Bank of America stock sold in 1929 was sold at a loss because the market value was approximately $250 per share when it was sold for about $150 per share; yet respondent determined that the cost basis of the stock was only $34.79 per share, and such determination was not questioned by petitioner.

We think petitioner has not shown that its failure to file returns within the time prescribed by law was due to reasonable cause. The delinquency penalties determined by respondent are, therefore, approved.

Reviewed by the Board.

> *Decision in respect of all deficiencies in tax and penalties, except the fraud penalty for 1929, will be entered for respondent.*

BLACK, dissenting: I dissent from the majority opinion wherein it holds that petitioner has not filed income tax returns for the taxable years in question so as to entitle it to have allowed whatever legal deductions it has proved by the evidence in this case. The returns which petitioner has filed, though late, should in my opinion be considered as removing the ban prescribed by section 233 to the taking of otherwise legal deductions. Petitioner should be taxed with a

delinquency penalty of 25 percent of whatever deficiencies there may be, if any, computed by the allowance of whatever legal deductions may have been proven. Cf. *Anglo-American Direct Tea Trading Co., Ltd.*, 38 B. T. A. 711.

ARUNDELL and HARRON agree with this dissent.

LEECH: I concur in the above dissent and, in addition, disagree with the conclusion which the majority reaches on the point appearing as number 4 in the headnote.