156 T.C. No. 2

UNITED STATES TAX COURT

ADAMS CHALLENGE (UK) LIMITED, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4816-15.                    Filed January 21, 2021.


P is a U.K. corporation whose sole income-producing asset for
the years at issue was a multipurpose support vessel. The vessel was
chartered by a U.S. firm to assist in decommissioning oil and gas
wells and removing debris on portions of the U.S. Outer Continental
Shelf in the Gulf of Mexico. During 2009 and 2010 P derived from
the charter gross income of about $32 million, which was effectively
connected with the conduct of a U.S. trade or business. <u>See</u> <u>Adams
Challenge (UK) Ltd. v. Commissioner</u>, 154 T.C. 37 (2020).

P did not file a Federal income tax return for 2009 or 2010. On
April 9, 2014, R prepared and subscribed returns for P for these years.
<u>See</u> I.R.C. sec. 6020(b). In November 2014, R issued P a notice of
deficiency determining (among other things) that P was entitled to no
deductions or credits for 2009 or 2010 because it had failed to file re-
turns. <u>See</u> I.R.C. sec. 882(c)(2). In February 2015 P petitioned this
Court for redetermination. In February 2017 P submitted to R protec-
tive returns for 2009 and 2010.

P filed a motion for partial summary judgment challenging R's disallowance of deductions and credits and urging that R's action violated the business profits and the nondiscrimination articles of the bilateral income tax treaty between the United States and the U.K. (Treaty). R filed a cross-motion urging that disallowance of deductions and credits in these circumstances is consistent with both I.R.C. sec. 882(c)(2) and the Treaty.

Held: Under I.R.C. sec. 882(c)(2), P is not entitled to the benefit of deductions or credits because it did not submit "returns" for 2009 and 2010 until after R had prepared and subscribed returns for it.

Held, further, I.R.C. sec. 882(c)(2) as thus interpreted does not violate either the business profits article or the nondiscrimination article of the Treaty.

Andrius R. Kontrimas and Robert C. Morris, for petitioner.

William D. White, Richard A. Rappazzo, Russell S. Shieldes, and Timothy L. Smith, for respondent.

OPINION

LAUBER, Judge: Petitioner is a company incorporated under the laws of the United Kingdom (U.K.). For the tax years at issue petitioner's only income-producing asset was a multipurpose support vessel. A U.S. firm chartered petitioner's vessel to perform work decommissioning oil and gas wells and removing

hurricane-related debris on portions of the U.S. Outer Continental Shelf (OCS) in the Gulf of Mexico. From this charter petitioner during 2009-2011 earned gross income of about $45 million. In a prior Opinion we held that this income was "effectively connected" with the conduct of a U.S. trade or business and was subject to tax under the Internal Revenue Code (Code)[1] and the bilateral income tax treaty between the United States and the U.K. (Treaty).[2] See Adams Challenge (UK) Ltd. v. Commissioner, 154 T.C. 37 (2020).

Currently before the Court is a second round of cross-motions for partial summary judgment. Petitioner did not file Federal income tax returns for 2009 and 2010 until February 2017. That was more than two years after the Internal Revenue Service (IRS or respondent) had prepared returns for it under section 6020(b) and issued the notice of deficiency on which this case is based. Invoking section 882(c)(2) and the case law and regulations interpreting it, respondent contends that petitioner is not entitled to any deductions or credits against its gross income for 2009 and 2010. Petitioner contends that the regulations are invalid

---

[1]Unless otherwise indicated, all statutory references are to the Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2]Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital Gains, U.K.-U.S., July 24, 2001, T.I.A.S. No. 13,161 (entered into force Mar. 31, 2003).

under <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), and that respondent's refusal to allow deductions and credits in these circumstances violates the business profits and the nondiscrimination articles of the Treaty. Concluding that respondent has the better side of both arguments, we will grant his motion for partial summary judgment and deny petitioner's.

<u>Background</u>

The following facts are based on the parties' motion papers, the stipulation of facts, and the attached exhibits. During the tax years at issue petitioner had its registered office and mailing address in Northampton, England.

Petitioner was formed in 2006 as a private limited liability company under U.K. law. It is a subsidiary of a Bermuda entity wholly owned by Khalifa A. Algosaibi Diving and Marine Technical Services Co., a Saudi Arabian branch of a Bahraini entity. Petitioner is the registered owner of a multipurpose support vessel, the M.V. <u>Adams Challenge</u> (Challenge Vessel), which was placed in service on January 1, 2009. During 2009-2011 the Challenge Vessel was petitioner's only income-producing asset.

EPIC Diving & Marine Services, LLC (EPIC), is an oil and gas services company that specializes in decommissioning oil and gas wells and related activities. On May 15, 2009, EPIC and petitioner entered into a standard time charter

for the Challenge Vessel. During 2009-2011 EPIC used the Challenge Vessel for work on 11 projects in various "blocks" within the Gulf of Mexico. Each project site was within 200 miles of the coast of Louisiana or Texas, within the OCS.

In 2009 the IRS initiated a compliance program with respect to foreign vessels operating on the OCS, particularly in the Gulf of Mexico. The IRS identified the owners, operators, and classification of such vessels using a product supplied by Lloyd's Register Group, Ltd. Employing a satellite-enabled tracking service, the IRS determined the number of days the vessels operated on the OCS. And employing data supplied by Workboat, which publishes the average day charter rates for different types of offshore service vessels, the IRS estimated the annual income earned by specific foreign ships, including the Challenge Vessel.

On October 18, 2013, the IRS issued petitioner a Notice of Jeopardy Assessment and Right of Appeal (jeopardy notice) assessing tax, penalties, and interest totaling $23,780,625 for 2009-2011. The IRS made the jeopardy assessment because it believed that petitioner's charter with EPIC had expired and that the Challenge Vessel's departure from U.S. taxing jurisdiction would leave petitioner with no assets subject to collection. The IRS accordingly concluded that collection of the tax would be endangered if regular assessment and collection procedures were followed. See sec. 6861(a).

On November 5, 2013, petitioner protested the jeopardy notice. It attached to its protest a subsequent time charter with EPIC, which showed that the Challenge Vessel would remain in the Gulf of Mexico through October 2016. Concluding that petitioner was not intending to depart from U.S. territorial waters, the Appeals Office directed that the jeopardy assessment be abated. It explained that "this determination reflects only the abatement of the jeopardy assessment and does not affect any further determination" regarding petitioner's tax liability.

At the time of the jeopardy notice petitioner had not filed U.S. income tax returns for any years. On December 13, 2013, it filed with the IRS office in Houston, Texas, a Form 1120-F, U.S. Income Tax Return of a Foreign Corporation, for 2011. Having received no return from petitioner for 2009 or 2010, the IRS on April 9, 2014, prepared and subscribed returns for petitioner for those years. See secs. 6020(b), 7701(a)(11)(B).[3]

On November 25, 2014, the IRS sent petitioner a notice of deficiency for 2009-2011. As relevant here, the notice determined that petitioner had effectively connected income of $13,595,167 for 2009 and $19,135,125 for 2010 and that petitioner was entitled to no deductions or credits for either year because it had

---

[3]Such returns are often called "substitutes for returns" or "SFRs."

failed to file returns. On February 20, 2015, petitioner timely petitioned this Court for redetermination.

Two years later, petitioner submitted protective returns for 2009 and 2010. These returns, received by the Ogden Service Center on February 15, 2017, reported no income or deductions and left most lines blank. In an attachment to each return petitioner explained:

> ADAMS Challenge * * * does not believe that it had any income effectively connected with the conduct of a trade or business within the United States during this tax year, and is currently litigating this issue in the United States Tax Court * * *. However, in the unlikely event that it is determined that ADAMS Challenge * * * had gross income which is effectively connected with the conduct of a [U.S.] trade or business * * * , ADAMS Challenge * * * files this Form 1120-F solely to protect its right to receive the benefit of the deductions and credits attributable to such gross income.

## Discussion

### I.  Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. & Subs. v. Commissioner, 118 T.C. 226, 238 (2002). The sole question presented at this stage of the

proceedings is whether respondent erroneously determined that petitioner should be allowed no deductions or credits for 2009 and 2010.[4]

In support of his position respondent relies on section 882(c)(2), judicial decisions interpreting that provision and its predecessors, and a regulation promulgated in 1990. See sec. 1.882-4(a)(3)(i), Income Tax Regs. Petitioner challenges the validity of that regulation and urges that respondent's position is inconsistent with the Treaty. The parties have filed cross-motions for summary judgment on these questions, and we find that they may be adjudicated summarily.

II.    Legal Background

The Code generally allows a deduction for expenses incurred in the operation of a trade or business. See sec. 162(a). The "income tax deduction is a matter of legislative grace," designed to ensure that income is generally taxed on a net basis. See Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943). Certain expenses are expressly allowed as deductions by statute, while others are expressly disallowed. See, e.g., sec. 280E (disallowing a deduction where the trade or business involves "trafficking in controlled substances").

---

[4]Petitioner filed its return for 2011 on December 13, 2013, before the expiration of the deadline specified by sec. 1.882-4(a)(2) and (3)(i), Income Tax Regs. Respondent concedes that petitioner is entitled to deductions and credits for 2011 to the extent it can substantiate its entitlement to them.

Foreign corporations generally are allowed deductions "if and to the extent that they are connected with income which is effectively connected with the conduct of a [U.S.] trade or business." Sec. 882(c)(1)(A). Congress recognized, however, that it is far more difficult for the Commissioner to determine the correct tax liability of foreign (as opposed to U.S.) corporations. "Indeed, unless a foreign corporation is induced voluntarily to advise the Commissioner of all of its [U.S.] income * * *, the Commissioner may never learn even of the corporation's existence." Blenheim Co. v. Commissioner, 125 F.2d 906, 909 (4th Cir. 1942), aff'g 42 B.T.A. 1248 (1940). Since 1928 Congress has accordingly conditioned the grant of deductions to a foreign corporation upon its filing of a U.S. income tax return. "This means, of course, that a foreign taxpayer cannot 'play the lottery' about whether it is engaged in a U.S. trade or business and then * * * claim deductions significantly moderating its U.S. income tax liability." Boris I. Bittker et al., Federal Income Taxation of Corporations & Shareholders: Forms, para. 15.04, at *5 (Westlaw 2020), FTXCORP FORM WGL.

This limitation on the allowance of deductions and credits is now set forth in section 882(c)(2). It provides in relevant part:

> A foreign corporation shall receive the benefit of the deductions and credits allowed to it in this subtitle only by filing or causing to be filed with the Secretary a true and accurate return, in the manner

prescribed in subtitle F, including therein all the information which the Secretary may deem necessary for the calculation of such deductions and credits. * * *

Subtitle F of the Code, captioned "Procedure and Administration," includes various requirements for the filing of returns, including the time for filing. See secs. 6071 and 6072. But while conditioning the allowance of deductions and credits on the filing of a return "in the manner prescribed in subtitle F," section 882(c)(2) does not explicitly require that the foreign corporation's return be filed timely, or that a delinquent return be filed by any particular deadline. The question we must decide is whether section 882(c)(2) establishes a cutoff point or terminal date after which it is too late for a foreign corporation to file a return and benefit from deductions and credits. This question has been the subject of judicial discussion for almost a century.

A.    Statutory and Case Law Development

Section 882(c)(2) has its genesis in a provision of the Revenue Act of 1928. Section 233 of that Act provided that a foreign corporation was entitled to deductions and credits only if it filed "a true and accurate return of its total income received from all sources in the United States, in the manner prescribed in this title."

Revenue Act of 1928, ch. 852, sec. 233, 45 Stat. at 849. Congress reenacted this provision verbatim in the Revenue Acts of 1932, 1934, 1936, and 1938.[5]

We addressed the requirements of section 233 in <u>Anglo-American Direct Tea Trading Co. v. Commissioner</u>, 38 B.T.A. 711 (1938).[6] The taxpayer there was a U.K. corporation that had a wholly owned U.S. subsidiary. <u>Id.</u> at 711. The taxpayer received dividends from its subsidiary in 1932 and 1933 but did not report those dividends on a timely filed U.S. income tax return. <u>Id.</u> at 712. Because corporations were allowed a deduction for dividends received, the net income the taxpayer would have reported on a U.S. return would have been zero for each year. <u>Ibid.</u>

The IRS opened an examination of the subsidiary's returns,[7] discovered that its parent had not filed U.S. returns, and undertook to prepare returns for the parent. <u>Ibid.</u> But before the IRS mailed those returns to the taxpayer or issued a

---

[5]<u>See</u> Revenue Act of 1932, ch. 209, sec. 233, 47 Stat. at 230; Revenue Act of 1934, ch. 277, sec. 233, 48 Stat. at 737; Revenue Act of 1936, ch. 690, sec. 233, 49 Stat. at 1717; Revenue Act of 1938, ch. 289, sec. 233, 52 Stat. at 531.

[6]We have treated as our own the precedent established by the Board of Tax Appeals, the predecessor of this Court. <u>See</u> <u>Coca-Cola Co. & Subs. v. Commissioner</u>, 155 T.C. __, __ (slip op. at 87 n.30) (Nov. 18, 2020); <u>Smith v. Commissioner</u>, 91 T.C. 1049, 1053 (1988), <u>aff'd</u>, 926 F.2d 1470 (6th Cir. 1991).

[7]At the time the IRS was known as the Bureau of Internal Revenue. For the sake of simplicity we will use "IRS" to refer to its predecessor as well.

notice of deficiency, the taxpayer in April 1935 filed delinquent returns for 1932 and 1933, reporting its dividend income and corresponding dividend deductions. Ibid. The Commissioner disallowed the deductions. Ibid.

The taxpayer contended that it had complied with section 233 by filing returns and that section 233 did not require that the returns be filed timely. Id. at 713. Acknowledging that section 233 did not set forth an explicit deadline, the Commissioner noted that the statute required foreign corporations to file their returns "in the manner prescribed in this title." Ibid. In the Commissioner's view, this "means that deductions are allowable only when returns are filed within the time specified in section 235 of the Revenue Acts of 1928 and 1932." Ibid. Section 235 of those Acts, the predecessor of section 6072, required corporate taxpayers to file returns by May 30 after the close of each year, whereas Anglo-American did not file its 1932 and 1933 returns until April 1935. Ibid.

"A careful reading of sections 233 and 235," we concluded, "discloses no indication of a legislative intent to extend the meaning of 'manner' so as to include 'time.'" Id. at 715. "Neither section provides that the deductions may not be allowed unless the return is filed within the time prescribed." Ibid. We accordingly held "that the mere fact the return was not filed within the time prescribed by

section 235 does not, under the circumstances here present, preclude the allowance of the deductions claimed." Id. at 716.

We revisited the scope of section 233 the following year in Taylor Securities, Inc. v. Commissioner, 40 B.T.A. 696 (1939). The taxpayer there, a Canadian corporation, derived U.S.-source income during 1930-1935 but filed no U.S. corporate income tax returns. Id. at 697. In March 1937 the IRS prepared and subscribed a return for each year under the predecessor of section 6020(b), then issued the taxpayer a notice of deficiency that allowed no deductions. Id. at 697-698. The taxpayer timely petitioned this Court in June 1937. Id. at 698. Eighteen months later, in December 1938, the taxpayer filed returns for the six years at issue. Id. at 699.

In Taylor Securities we did not question the holding in Anglo-American that the phrase "in the manner prescribed in this title," as used in section 233, "did not mean within the time prescribed in the title[]" for filing returns. Id. at 702. The fact that the taxpayer's returns were filed late, therefore, was not necessarily fatal to its claim for deductions. But we distinguished Anglo-American on its facts: "Here the question is whether the petitioner, by filing returns after the respondent made his determination of deficiencies * * *, relieved itself of the adverse condition in which it was situated by reason of section 233." Id. at 703.

- 14 -

We answered that question in the negative, rejecting the notion that "in enacting section 233 * * * it was the intention of Congress that delinquent returns filed by a foreign corporation after the respondent's determination should constitute the returns required" by the statute.  Ibid.  We concluded:

> [I]t is inconceivable that Congress contemplated * * * that taxpayers could wait indefinitely to file returns and eventually when the respondent determined deficiencies against them they could then by filing returns obtain all the benefits to which they would have been entitled if their returns had been timely filed.  Such a construction would put a premium on evasion, since a taxpayer would have nothing to lose by not filing a return * * *  [Id. at 703-704.]

We accordingly held that a foreign corporation loses its right to deductions and credits if it does not file a return until after the IRS has prepared a return for it and notified the taxpayer of the deficiency determination.  Id. at 704.

Next came Ardbern Co. v. Commissioner, 41 B.T.A. 910 (1940), modified and remanded, 120 F.2d 424 (4th Cir. 1941).  The taxpayer there, a Canadian corporation, derived U.S.-source income during 1929-1932 but did not file U.S. income tax returns.  Id. at 911-915.  A revenue agent commenced an examination and issued a 30-day letter.  Id. at 915.  The taxpayer's attorney promptly prepared returns and in June 1937 sought to file them with an IRS representative, who refused to accept them.  Ibid.  The following month the Commissioner prepared and subscribed a return for each year and issued a notice of deficiency that allowed no

deductions. Id. at 915, 918. In October 1938, after learning of the Commissioner's position that its returns had not been properly filed, the taxpayer refiled the returns with the Collector of Internal Revenue at Baltimore, Maryland. Id. at 916.[8]

Because the taxpayer's returns were not properly filed until after the Commissioner had prepared returns for it, we sustained the Commissioner's determination. See id. at 919-920 (citing Taylor Sec., Inc., 40 B.T.A. 696). On that point the U.S. Court of Appeals for the Fourth Circuit reversed. Ardbern Co., 120 F.2d at 425-426. The parties on appeal agreed that, if the returns the taxpayer had tried to file with the IRS representative in June 1937 had been filed at that time with the Collector at Baltimore, the statute would have been satisfied and the taxpayer would be entitled to the deductions. See id. at 426. "[Y]et fair dealing between the Government and a taxpayer," the court concluded, "would require the agent to whom the returns were improperly tendered for filing to advise the taxpayer as to the official and place where the returns should be filed." Ibid. Because the taxpayer "attempted in good faith" to file returns before the IRS prepared returns for

---

[8]At that time corporations were required to file returns with the Collector of Internal Revenue for the district in which their principal place of business was located or (if they had no U.S. place of business) with the Collector in Baltimore, Maryland. See Revenue Act of 1928, ch. 852, sec. 53(b)(2), 45 Stat. at 808; Ardbern Co., 41 B.T.A. at 919.

it, the court held that "elementary justice" required the Commissioner to allow the deductions.  Ibid.

We followed Taylor Securities once again in Blenheim Co. v. Commissioner, 42 B.T.A. 1248.  The taxpayer there, a Canadian corporation, derived U.S.-source income during 1934 but did not file a U.S. corporate income tax return.  Id. at 1249.  The IRS sent the taxpayer and its U.S. representatives "numerous letters" requesting that a Form 1120 be filed, but the taxpayer did not do so.  Ibid.  In April 1938 the Commissioner prepared and subscribed a return for the taxpayer and in May 1938 sent it a notice of deficiency that allowed no deductions.  Id. at 1249-1250.  The taxpayer filed a Form 1120 three months later, in August 1938. Id. at 1250.

We sustained the Commissioner's determination, citing Taylor Securities. Id. at 1251-1252.  We held that "a 'return' filed by a taxpayer after such a return has been prepared and filed for him by * * * [the IRS] is a nullity and does not comply with section 233."  Id. at 1251.  "The taxpayer can not thus take advantage from an alleged return submitted by the taxpayer not only after the respondent's filing of its return under * * * [the predecessor of section 6020(b)], but also after the issuance of a notice of deficiency."  Ibid.  We again distinguished Anglo-

American because that case "held only that a return filed before the determination of a deficiency was sufficient compliance with section 233." Ibid.

This time the Fourth Circuit affirmed. Blenheim Co., 125 F.2d 906. The court viewed the case as "a striking example of the many administrative problems inherent in the application of the [F]ederal income tax to foreign corporations," a situation the court described as "pregnant with possibilities of tax evasion." Id. at 909. The court acknowledged that section 233 "contains no reference to a time element." Id. at 908. But it concluded that the statute nevertheless required a foreign corporation to file its return before a "terminal date, which the Board of Tax Appeals first adopted in Taylor Securities." Id. at 910 (citing Taylor Sec., Inc., 40 B.T.A. 696). The Fourth Circuit defined that "terminal date" as the date on which the Commissioner prepared a return for the taxpayer:

> The conclusion that the preparation of a return by the Com-
> missioner a reasonable time after the date it was due terminates the
> period in which the taxpayer may enjoy the privilege of receiving
> deductions by filing its own return, is consistent not only with the
> intention of Congress as evidenced by the legislative history of
> Section 233, but also with considerations of sound administrative
> procedure and the generally accepted rule concerning the number of
> returns which may be filed. [Ibid.]

The court found support for this conclusion in a parallel provision govern-
ing nonresident alien individuals. See id. at 909. Section 217 of the Revenue Act

of 1918, the text of which was virtually identical to section 233 of the 1928 Act, provided that no deductions or credits would be allowed to nonresident aliens unless they filed "a true and accurate return * * * in the manner prescribed by this title." Revenue Act of 1918, ch. 18, sec. 217, 40 Stat. at 1069-1070. In 1919 the Department of the Treasury (Treasury) issued a regulation interpreting that provision. See Regs. 45, art. 311. This regulation stated that, if a foreign individual had U.S.-source income and filed no U.S. return: "[T]he Commissioner will cause a return of income to be made and include therein the income of such nonresident alien from all sources concerning which he has information, and he will assess the tax and collect it * * * , without allowance for deductions and credits." Ibid.

As the court noted, this regulation "states specifically that deductions are allowable to a nonresident alien only if a return is filed, and, if no return has been filed at the time the Commissioner prepares a return for the taxpayer, the tax shall be assessed with no allowance for deductions." Blenheim Co., 125 F.2d at 910. The court concluded that the "terminal date" principle embodied in this regulation should likewise apply to foreign corporations, because "Congress may be presumed to have adopted this longstanding administrative construction when it enacted and reenacted Section 233." Ibid.

The Fourth Circuit acknowledged its precedent in Ardbern Co., where it recognized an exception for a taxpayer that "attempted in good faith to file a return" before the Commissioner made a return for it. Id. at 911 (quoting Ardbern Co., 120 F.2d at 426). The court thus refrained from "prescribing an absolute and rigid rule that whenever the Commissioner files a return for a foreign corporation the taxpayer is completely and automatically denied the benefit of deductions or credits." Id. at 910. But it held that "the facts of the instant case justify a disallowance of deductions which * * * [the taxpayer] might otherwise have been entitled to claim, had it filed a timely return in compliance with the statutory requirement." Ibid. Any other construction of the statute, the court concluded, "would put a premium on tax evasion and would reduce the administration of the tax laws to mere idle activity." Id. at 912.

The Fourth Circuit reaffirmed the "terminal date" principle in Georday Enterprises, Ltd. v. Commissioner, 126 F.2d 384 (4th Cir. 1942), aff'g a Memorandum Opinion of the Board of Tax Appeals. The taxpayer there, a Canadian corporation, derived U.S.-source income for 1932 but did not file a U.S. return. Id. at 385-386. In 1935 the IRS notified the taxpayer of a proposed deficiency, but the taxpayer continued to resist filing a return. Id. at 386. In April 1938 the IRS prepared and subscribed a return for the taxpayer and sent it a notice of deficiency

that allowed no deductions. Id. at 386-387. The taxpayer petitioned this Court in June 1938 and filed a return for 1932 three months later, in September 1938. Id. at 387.

The Fourth Circuit sustained the disallowance of deductions: "Georday * * * clearly failed to file its return within the reasonable terminal period prescribed in the Blenheim case and is now precluded from obtaining the benefits of any deductions it might have otherwise been entitled to claim." Id. at 388. Indeed, the court found the case for disallowance stronger than in Blenheim "because Georday failed to file a return voluntarily not only after a return had been filed for it by the Commissioner and after a deficiency letter had been sent to it, but even after a petition to the Board had been filed." Ibid.

B.    Promulgation of 1957 Regulations

Congress recodified section 233 in section 882(c)(1) of the 1954 Code. See 26 U.S.C. sec. 882(c)(1) (Supp. II 1954). It provided, as section 233 had provided, that a foreign corporation was entitled to deductions and credits only if it filed "a true and accurate return of its total income received from all sources in the United States, in the manner prescribed in subtitle F." The Senate Finance Committee stated that this provision was "in substance, identical" to section 233 of the 1928 Act. S. Rept. No. 83-1622, at 417 (1954), 1954 U.S.C.C.A.N. 4621, 5060.

In 1956 Treasury proposed regulations addressing the taxation of nonresident aliens and foreign corporations. 21 Fed. Reg. 2819 (May 1, 1956). These regulations were finalized the following year. See T.D. 6258, 1957-2 C.B. 368. For nonresident alien individuals, the regulations carried forward the provision stating that, if no return was filed, the IRS would make a return for that person, assess the tax, and "collect it * * * without allowance for deductions or credits." 26 C.F.R. sec. 1.874-1(c) (1958). The Fourth Circuit in Blenheim had relied on the predecessor of this provision to support its conclusion that section 233 of the 1928 Act included a "terminal date" for filing. See Blenheim Co., 126 F.2d at 910. The 1957 regulations then added a parallel provision for foreign corporations. See 26 C.F.R. sec. 1.882-4(b)(3) (1958). It stated as follows:

> If a resident foreign corporation has various sources of income within the United States and a return of income has not been filed by it or on its behalf, the district director shall (i) cause a return of income to be made, (ii) include therein the [U.S.-source] income * * * concerning which he has information, and (iii) assess the tax and collect it from one or more of those sources * * * without allowance for any deductions.

Congress amended section 882 a decade later, renumbering section 882(c)(1) of the 1954 Code as section 882(c)(2). Foreign Investors Tax Act of 1966, Pub. L. No. 89-809, sec. 104(b)(1), 80 Stat. at 1556. But the text remained virtually identical. See 26 U.S.C. sec. 882(c)(2) (Supp. II 1966). The House

Ways and Means Committee explained: "Paragraph (2) of section 882(c) continues the substance of the rule contained in section 882(c)(1) of existing law that a foreign corporation is to receive the benefit of the allowable deductions only by filing a true and accurate return of its total income." H.R. Rept. No. 89-1450, at 90 (1966), 1966-2 C.B. 967, 1030.

We revisited the case law interpreting section 233 of the 1928 Act in Brittingham v. Commissioner, 66 T.C. 373 (1976), aff'd per curiam, 598 F.2d 1375 (5th Cir. 1979). The IRS there had disallowed deductions for a nonresident alien individual under section 874(a), the provision that parallels section 882(c)(2) for foreign corporations. See id. at 408. Although the taxpayer had filed returns timely, the IRS determined that he had substantially underreported his income, so that his returns were not "true and accurate" as the statute required. Ibid. We agreed. Citing Blenheim Co., 42 B.T.A. at 1253, we held that "the mere filing of a return is insufficient." Id. at 409. We noted that "[t]his provision of the statute is long standing, and the similar provision with respect to foreign corporations has been applied whenever returns fail to include material information." Ibid. (citing section 882(c)(2) and Blenheim Co., 42 B.T.A. at 1253).

C.      Promulgation of 1990 and 2003 Regulations

The case law interpreting section 233 of the 1928 Act, coupled with the 1957 regulations interpreting section 882(c), established several propositions as to which there was no conflicting authority.  The statute does not require a foreign corporation to file a timely return--i.e., to file a return within the time prescribed in subtitle F--in order to preserve its entitlement to deductions and credits.  However, the statute does establish a "terminal date" by which such a return must be filed.  That "terminal date" is the date on which the Commissioner exercises his authority to prepare and subscribe a return for the taxpayer under section 6020(b) or its predecessor.  This terminal period for filing a return was not fixed but varied depending on when the Commissioner exercised that authority.  As the Fourth Circuit held in Ardbern Co., 120 F.2d at 426, a taxpayer's failure to file within the terminal period could be excused upon a showing of "good faith."  And while the requirement of a "true and accurate return," sec. 882(c)(2), did not require perfection, the omission of "material information" from a timely filed return was fatal to a claim for deductions, Brittingham, 66 T.C. at 409.

That said, several uncertainties remained.  The length of the "terminal period" was not fixed and could vary from several months to many years, depending on when the Commissioner exercised his authority to prepare a return for the tax-

payer. The scope of the "good faith" defense was undefined and had not been addressed by a court since 1942. And it was unclear what level of misreporting would prevent a timely filed return from being deemed "true and accurate."

To clarify these questions and provide greater uniformity in application, Treasury in 1989 issued a notice of proposed rulemaking. 54 Fed. Reg. 31545 (July 31, 1989). The proposed regulations set forth substantially similar provisions governing nonresident alien individuals and foreign corporations. See id. at 31546-31548. The final regulations, promulgated the following year, made four principal changes to the 1957 regulations insofar as they affected foreign corporations. See T.D. 8322, 1990-2 C.B. 172.

First, Treasury prescribed a definite deadline for the filing of a return by a foreign corporation where (as here) the current year was the first year for which it was required to file a U.S. return. That filing deadline was "18 months of the due date as set forth in section 6072" for the filing of a return. T.D. 8322, 1990-2 C.B. at 175; see sec. 1.882-4(a)(3)(i), Income Tax Regs. Responding to commenters who had "questioned the validity of the filing deadlines," Treasury replied that "the statute clearly provides for the denial of deductions and credits if returns are not filed in a timely manner," adding that filing deadlines were "justified because

of different administrative and compliance concerns with regard to * * * foreign corporations." T.D. 8322, 1990-2 C.B. at 172.

Second, if a foreign corporation believed it had no U.S. income tax liability, it was permitted to file a return reporting no gross income or deductions, attaching a statement that the return was being filed for protective reasons. By so doing it would "protect the right to receive the benefit of * * * deductions and credits" if it was later determined to have U.S. taxable income. Id., 1990-2 C.B. at 175; see sec. 1.882-4(a)(3)(vi), Income Tax Regs.

Third, the 1990 regulations clarified that the existence of a bilateral income tax treaty did not immunize a foreign corporation from meeting the filing deadlines. "A foreign corporation which has a [U.S.] permanent establishment, as defined in an income tax treaty between the United States and the foreign corporation's country of residence, * * * is subject to the filing deadlines set forth in paragraph (a)(3)(i) of this section." T.D. 8322, 1990-2 C.B. at 175; see sec. 1.882-4(a)(3)(v), Income Tax Regs.

Finally, the 1990 regulations addressed the "good faith" defense. They gave that defense a narrow scope, stating that the IRS could waive the filing deadline "in rare and unusual circumstances" if good cause were shown. T.D. 8322, 1990-2 C.B. at 175; see 26 C.F.R. sec. 1.882-4(a)(3)(ii) (1990). In 2002 Treasury con-

cluded that this rule was "too restrictive" and issued temporary and proposed regulations adjusting the waiver standard. T.D. 8981, 2002-1 C.B. 496. The proposed regulations were finalized the next year. See T.D. 9043, 2003-1 C.B. 611. The regulations as revised provide that the filing deadline will be waived if the foreign corporation establishes that it "acted reasonably and in good faith in failing to file a U.S. income tax return (including a protective return * * * )." Sec. 1.882-4(a)(3)(ii), Income Tax Regs. Under this standard the Commissioner considers a list of factors, illustrated by six examples, to assess whether a corporation has acted reasonably and in good faith. See id. subdivs. (ii)(A)-(F), (iii).

In Espinosa v. Commissioner, 107 T.C. 146 (1996), we addressed the statutory and regulatory provisions governing deductions claimed by nonresident alien individuals. The taxpayer there, a Mexican national, derived U.S.-source income during 1987-1991 but filed no U.S. income tax returns. Id. at 147-148. The IRS sent him letters requesting that he file returns, but he declined to do so. Id. at 148. In March 1993 the IRS informed him that it had prepared and filed returns for him that allowed no deductions. Ibid. In October 1993 the taxpayer submitted returns reporting losses for each year. Ibid. In January 1994 the IRS issued a notice of deficiency determining that he was entitled to no deductions, pursuant to section 874(a). Ibid.

We first addressed the taxpayer's 1987-1989 tax years, which were not covered by the 1990 regulations. See id. at 151. Finding "no cases dealing squarely with the application of section 874(a), or its predecessors, in the context of an untimely submitted return," id. at 152-153, we relied on the "terminal date" cases decided by the Fourth Circuit and the Board of Tax Appeals with respect to foreign corporations, id. at 153-156. "Because of the similarity of sections 874(a) and 882(c)(2), in both language and the intent of the provisions," we concluded that the two provisions should be interpreted "in pari materia." Id. at 153.

Although neither section 874(a) nor section 882(c)(2) contains an "express time limit," we held that, for foreign individuals as well as foreign corporations, "there exists a terminal date, after which a taxpayer can no longer claim the benefit of deductions by filing a return." Id. at 156 (citing Blenheim Co. and Taylor Sec., Inc.). We reaffirmed that, absent "compelling equitable considerations, such as those existing in Ardbern Co.," this terminal date is the date on which the Commissioner prepares and subscribes a return for the taxpayer under section 6020(b). Ibid. We cited Blenheim Co. for the principle that "a 'return' filed by a taxpayer after such a return has been prepared and filed for him by * * * [the IRS] is a nullity and does not comply with * * * [the statute]." Id. at 155 (quoting Blenheim Co., 42 B.T.A. at 1251). And we relied on the Fourth Circuit's conclusion that

this result comports with "the generally accepted rule concerning the number of returns which may be filed" for a given year. Ibid. (quoting Blenheim Co., 125 F.2d at 910).

On the basis of the case law interpreting section 233 of the 1928 Act, we held in Espinosa that a nonresident alien individual forfeits his rights to deductions and credits if he fails to file a return before the Commissioner has prepared a return for him. Id. at 156-158. "If no cut-off point existed, taxpayers would have an indefinite time to file a return, and these provisions would be rendered meaningless." Id. at 157. We accordingly sustained the Commissioner's determination that the taxpayer was entitled to no deductions or credits for 1987-1989.

The final two years at issue in Espinosa were governed by the 1990 regulations, which were effective for taxable years ending after July 31, 1990. See id. at 151. For those years the taxpayer essentially contended that the filing deadline in the regulation was invalid. Id. at 158. We found no need to address that argument: "Under the factual circumstances here the regulation confers no additional rights on petitioner, and even if we were to hold some portion of this regulation invalid, petitioner would not prevail under our analysis of * * * section 874(a) and the relevant case law." Ibid. In short, we held that the taxpayer would lose under the bare text of the statute, without regard to the regulation, because the taxpayer

did not file his 1990 and 1991 returns until after the Commissioner had prepared returns for him. Ibid.

Finally, the taxpayer argued that the regulation violated the nondiscrimination article of the income tax treaty between the United States and Mexico. Id. at 159. That was so, the taxpayer contended, because the regulation "imposes a timely filing requirement on residents of * * * Mexico as a prerequisite to receiving the benefit of deductions, and no such requirement is imposed on U.S. residents." Ibid. "While we question[ed] whether there is a conflict between section 874(a) and the provisions of the treaty," we found no need to decide that question because the treaty was effective only "for taxable years beginning after 1993." Ibid.

III. Analysis

A. Petitioner's Entitlement to Deductions Under the Statute

Because petitioner directs most of its energy to challenging the regulations, we first consider how this case would be decided if the filing deadline set forth in the regulations did not exist. Petitioner does not question the validity of section 882(c)(2). We conclude that petitioner is entitled to no deductions under the statute, as its pertinent text, embodied in section 233 of the 1928 Act, has been construed by this Court and the only appellate court to consider the issue.

Section 882(c)(2) provides in relevant part:

> A foreign corporation shall receive the benefit of the deductions and credits allowed to it in this subtitle only by filing or causing to be filed with the Secretary a true and accurate return, in the manner prescribed in subtitle F, including therein all the information which the Secretary may deem necessary for the calculation of such deductions and credits. * * *

For 2009 and 2010 petitioner submitted returns that reported no income or deductions and left virtually all lines blank. Although these returns were not exactly "true and accurate," they appear to have qualified as protective returns under the regulations. See sec. 1.882-4(a)(3)(vi), Income Tax Regs. But these returns were not filed by the "terminal date" that the statute establishes.

Section 6020(b), captioned "Execution of Return by Secretary," provides that, if any person fails to make any return required by law, "the Secretary shall make such return from his own knowledge and from such information as he can obtain." Sec. 6020(b)(1). Section 6020(b)(2), captioned "Status of Returns," provides that "[a]ny return so made and subscribed by the Secretary shall be prima facie good and sufficient for all legal purposes." We have consistently held that a return prepared and executed by the Commissioner under section 6020(b) constitutes the taxpayer's "return" for the year at issue, e.g., for purposes of imposing the addition to tax under section 6651(a)(2) for failure to pay timely "the amount

shown as tax on any return." See Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006) ("A return made by the Secretary under section 6020(b) is treated as 'the return filed by the taxpayer for purposes of determining the amount of the addition[.]'" (quoting section 6651(g)(2))), aff'd, 521 F.3d 1289 (10th Cir. 2008); Hyde v. Commissioner, T.C. Memo. 2011-104 (same), aff'd, 471 F. App'x 537 (8th Cir. 2012).

Consistent with these principles, we held in Blenheim Co. that "a 'return' filed by a taxpayer after such a return has been prepared and filed for him by * * * [the IRS] is a nullity and does not comply with section 233" of the 1928 Act. Blenheim Co., 42 B.T.A. at 1251. The Fourth Circuit agreed with our reasoning and result, finding our interpretation of the statute consistent with "the generally accepted rule concerning the number of returns which may be filed" for a particular tax year. Blenheim Co., 125 F.2d at 910.

Only one valid "return" can be filed for any given year.[9] Once the Commissioner has prepared and subscribed a return for the taxpayer under section 6020(b),

---

[9]See Goldring v. Commissioner, 20 T.C. 79, 81 (1953) ("The word 'return' * * * include[s] only the original return."); Nat'l Refining Co. of Ohio v. Commissioner, 1 B.T.A. 236, 241 (1924) ("The phrase the return has a definite article and a singular subject; therefore, it can only mean one return[.]"); Benson v. Commissioner, T.C. Memo. 2006-55, 91 T.C.M. (CCH) 925, 927 (ruling that "[a]mended returns do not correct the omission of income from an original return" for purposes of sec. 6501(e)(1)(A)), aff'd, 560 F.3d 1133 (9th Cir. 2009).

the taxpayer cannot "fil[e] or caus[e] to be filed with the Secretary a true and accurate return" as section 882(c)(2) requires. The most the taxpayer can do is to file an amended return or a claim for refund, neither of which the Commissioner is obligated to accept.[10]

The IRS prepared and subscribed returns for petitioner, for its 2009 and 2010 taxable years, on April 9, 2014. On November 25, 2014, the IRS sent petitioner a notice of deficiency that allowed no deductions. Petitioner petitioned this Court on February 20, 2015. Petitioner did not submit a "return" for either year until February 15, 2017. The facts of this case are thus substantially identical to those in Georday Enterprises and Taylor Securities, where the taxpayer "failed to file a return voluntarily not only after a return had been filed for it by the Commis-

---

[10]See Badaracco v. Commissioner, 464 U.S. 386, 393 (1984) ("[T]he Internal Revenue Code does not explicitly provide either for a taxpayer's filing, or for the Commissioner's acceptance, of an amended return; instead, an amended return is a creature of administrative origin and grace."); Second Carey Tr. v. Commissioner, 2 T.C. 629, 634 (1943) ("The right to amend is granted to the 'Commissioner of Internal Revenue,' but no such right is granted to a taxpayer who has failed to file a return at the time required by law."); Rodriguez v. Commissioner, T.C. Memo. 2009-22, 97 T.C.M. (CCH) 1090, 1092 (ruling that "the IRS has full authority to prepare an SFR for anyone who fails to file his own return," so that "late-filed 1040s simply do not take precedence over the SFRs"). We have no occasion to address in this case the circumstances under which deductions and credits could be disallowed by the Commissioner's preparation of a return before expiration of the 18-month period specified in sec. 1.882-4(a)(3)(i), Income Tax Regs.

sioner and after a deficiency letter had been sent to it, but even after a petition to the Board had been filed." Georday Enters., Ltd., 126 F.2d at 388; see Taylor Sec., Inc., 40 B.T.A. at 699. Because petitioner failed to file a return for either year within the terminal period established by section 882(c)(2), it is entitled to no deductions or credits for either year.

Nor may petitioner benefit from the "good faith" exception established by the Fourth Circuit in Ardbern Co. The taxpayer there had "attempted in good faith" to file returns before the Commissioner prepared returns for it, but the Commissioner's representative refused to accept the returns. Ardbern Co., 120 F.2d at 425-426. In these unusual circumstances, the Fourth Circuit held that "elementary justice" and "fair dealing between the Government and a taxpayer" required that the filing deadline be tolled. Ibid. A taxpayer seeking shelter under this judicially created "good faith" exception must show "compelling equitable considerations." Espinosa, 107 T.C. at 156.

Petitioner can show no compelling equitable considerations. It filed a return for 2011 on December 13, 2013. Its income and expenses for 2009-2010--viz., charter income less the costs of operating the Challenge Vesssel--were presumably quite similar to its income and expenses for 2011. The IRS in October 2013 had issued petitioner a jeopardy notice for all three years, making clear its view that

petitioner had U.S. taxable income for 2009 and 2010. When the IRS abated the jeopardy assessment a month later, it stated that "this determination reflects only the abatement of the jeopardy assessment and does not affect any further determination" regarding petitioner's tax liabilities. Petitioner has offered no plausible excuse for failing to file returns for 2009 and 2010 until February 2017, much less shown that "elementary justice" dictates that it be allowed deductions and credits for those years.

Petitioner urges that the "terminal date" cases are distinguishable, asserting that they "generally involved acts of bad faith and purposeful disregard of * * * U.S. filing obligations" by foreign corporations. We do not find this attempted distinction persuasive. Most of those taxpayers were foreign investment companies; they believed, as petitioner allegedly believed, that they had no obligation to file a U.S. corporate income tax return. Indeed, several of the taxpayers, having received U.S.-source investment income, had filed U.S. personal holding company returns and maintained that these filings satisfied their U.S. filing obligations. See Blenheim Co., 125 F.2d at 907; Taylor Sec., Inc., 40 B.T.A. at 697-698. Neither the Board nor the Fourth Circuit made any determination that the foreign taxpayer's behavior "involved acts of bad faith."

In any event, petitioner's effort to distinguish these precedents on factual grounds is unavailing. The Fourth Circuit and the Board sustained the disallowance of deductions because the taxpayer had failed to file an income tax return before the IRS executed a return for it. These holdings rested on statutory construction--namely, on a determination that the taxpayer could not "file a true and accurate return," within the meaning of the statute, after the Commissioner had prepared and subscribed a return for that taxpayer for that tax year. The taxpayer's good faith or lack of it had no bearing on the meaning of the statute; it was relevant only in ascertaining whether the taxpayer could avail itself of the "good faith" defense recognized in Ardbern Co.

Petitioner asserts that it qualifies for that defense, urging that it showed good faith by "respond[ing] to the very first communication that * * * [it] received from [the IRS]," namely, the jeopardy notice issued in October 2013. Given the serious consequences that can flow from a jeopardy assessment--including possible seizure of the Challenge Vessel itself--petitioner's prompt appeal of the jeopardy assessment is not an especially strong indicator of good faith. Notably, petitioner did not identify itself to the IRS during the tax years at issue; it was discovered to be operating on the OCS only because the IRS initiated a compliance program using satellite tracking tools.

Petitioner notes that it did identify itself to other U.S. agencies, including the Coast Guard. But because petitioner needed Coast Guard permission to operate on the OCS as it wished to do, see Adams Challenge (UK) Ltd., 154 T.C. at 53-54, this action does not cut much mustard in assessing its good faith with respect to its U.S. tax obligations. In any event, the relevant question is not whether the taxpayer displayed good faith in some abstract sense, but whether it attempted in good faith to file a U.S. income tax return before the IRS prepared a return for it. See Ardbern Co., 120 F.2d at 426. There is no evidence that petitioner attempted to file a tax return for 2009 or 2010 before February 2017.

B.      Petitioner's Entitlement to Deductions Under the Regulations

As revised in 1990 and 2003, the regulations are generally more favorable to taxpayers than the preexisting case law. The regulations relax the statutory requirement of a "true and accurate return," sec. 882(c)(2), permitting foreign corporations to file protective returns showing zero income and deductions, see sec. 1.882-4(a)(3)(vi), Income Tax Regs. The regulations considerably expand the scope of the "good faith" defense. See id. subdivs. (ii) and (iii). And as applicable here, they set forth a fixed deadline for filing--"within 18 months of the due date as set forth in section 6072." Id. subdiv. (i). This deadline, as compared with the date on which the IRS prepares a return for the taxpayer, can be advantageous or

disadvantageous on the facts of a particular case. But a known (and reasonably generous) deadline benefits foreign taxpayers in a structural sense, because they cannot know in advance (and have no control over) the date on which the Commissioner may decide to exercise his authority under section 6020(b).

Petitioner does not seriously dispute that, under the regulations, it is entitled to no deductions for 2009 and 2010. Its filing of protective returns would appear to satisfy the requirement of section 1.882-4(a)(3)(vi), Income Tax Regs. But it was required to file these protective returns "within 18 months after the due date, as set forth in section 6072." Id. subdiv. (i). Section 6072(c) requires foreign corporations to file returns within 5½ months after the close of their tax year. Thus, foreign corporations generally have 23½ months after the close of their tax years to submit U.S. income tax returns before section 882(c)(2) comes into play.

The deadline for filing petitioner's 2009 return was thus December 15, 2011, and the deadline for filing its 2010 return was December 15, 2012. Petitioner did not file protective returns for those years until February 2017. It therefore missed the regulatory deadline by more than four years.

The regulations provide that the filing deadline "may be waived if the foreign corporation establishes to the satisfaction of the Commissioner * * * that the corporation, based on the facts and circumstances, acted reasonably and in good

faith in failing to file a U.S. income tax return (including a protective return
* * * )." Sec. 1.882-4(a)(3)(ii), Income Tax Regs.  "As a preliminary matter,
however, petitioner must establish that * * * [it] requested a waiver."  Espinosa,
107 T.C. at 159.  Petitioner has not shown that it requested a waiver.  Nor has it
shown that this Court would have "jurisdiction to review the disposition of such a
request" if one had been made.  Ibid.[11]

Petitioner's principal contention is that the filing deadline in the regulations
is invalid under this Court's Opinion in Swallows Holding, Ltd. v. Commissioner,
126 T.C. 96 (2006), vacated and remanded, 515 F.3d 162 (3d Cir. 2008).  In that
case we did not question the established line of authority, from this Court and the
Fourth Circuit, holding that the Commissioner's execution of a return for a foreign
taxpayer constitutes the "terminal date" by which that taxpayer must have filed a
return in order to be entitled to deductions and credits.  See id. at 115-124.  The

_____

[11]In any event, the "good faith" factors enumerated in the regulations do not
favor petitioner.  Petitioner did not "voluntarily identif[y] itself to the * * * [IRS]
as having failed to file a U.S. income tax return before the * * * [IRS] discover[ed]
the failure to file."  Sec. 1.882-4(a)(3)(ii)(A), Income Tax Regs.  Petitioner does
not contend (and there is no evidence) that it "did not become aware of its ability
to file a protective return * * * by the deadline for filing a protective return."  Id.
subdiv. (ii)(B).  Petitioner does not contend (and there is no evidence) that it
"failed to file a U.S. income tax return because of intervening events beyond its
control."  Id. subdiv. (ii)(E).  And petitioner has not addressed "[w]hether other
mitigating or exacerbating factors existed."  Id. subdiv. (ii)(F).

principle that we distilled from these precedents was that "the Commissioner's preparation of a substitute return for the corporation is generally considered to be the corporation's return for Federal income tax purposes and divests the taxpayer of its entitlement to file a return for itself." Id. at 137 n.22; see id. at 116 (noting that this Court had previously "reject[ed] any argument that the taxpayer's returns [submitted after the IRS had prepared returns for it] were 'returns' for this purpose").

In Swallows Holding, however, the IRS had not exercised its authority to prepare a return for the taxpayer. The taxpayer had voluntarily filed returns for all relevant years, but it had neglected to file them within 18 months of the filing date specified in section 6072, as the regulation required. See id. at 100-103. Because the "terminal date" precedents from this Court and the Fourth Circuit did not control the outcome, the IRS was forced to rely solely on the regulation to support its contention that the taxpayer should be allowed no deductions.

Applying the test set forth in Nat'l Muffler Dealers Ass'n v. United States, 440 U.S. 472 (1979), we held (over three dissents) that the filing deadline set forth in the regulation was invalid. See Swallows Holding, Ltd., 126 T.C. at 129-148. In so holding, we relied on the fact that the 1990 regulation was not a "substantially contemporaneous construction" of the statutory provision, which dated back to

1928. Id. at 137 (citing Nat'l Muffler Dealers Ass'n, 440 U.S. at 477). And we noted that Congress had reenacted the statute many times without injecting into it an explicit filing deadline. Id. at 138-139.

On appeal the U.S. Court of Appeals for the Third Circuit disagreed. Anticipating the Supreme Court's decision in Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44 (2011), the Third Circuit held that the validity of a tax regulation (as of regulations generally) must be analyzed under the two-step test in Chevron, 467 U.S. 837. See Swallows Holding, Ltd., 515 F.3d at 167-170. Applying step one of the Chevron test, the court held that section 882(c)(2) was ambiguous because the phrase, "in the manner prescribed in subtitle F," could be "interpreted to implicitly include a timing element." Id. at 171. And applying step two of the Chevron test, the court held that the filing deadline established by section 1.882-4(a)(3)(i), Income Tax Regs., was a permissible exercise of Treasury's authority. Because section 6072(c) "already provides for a five and one-half month filing period, foreign companies have, in practice, twenty-three and one-half months to submit a 'timely' return. It is not unreasonable for the Secretary to impose such a deadline." Swallows Holding, Ltd., 515 F.3d at 172.

Petitioner does not dispute that Chevron applies for purposes of determining the validity of the filing deadline set forth in section 1.882-4(a)(2) and (3)(i), In-

come Tax Regs. Largely ignoring the Third Circuit's analysis in <u>Swallows Holding</u>, petitioner urges that we reject that analysis because appeal of the instant case does not appear to lie to that court. Respondent requests that "the Court overrule its prior opinion in <u>Swallows Holding I</u> because the <u>Chevron</u> analysis materially differs from the Court's <u>National Muffler</u> analysis."

We decline both parties' invitations. Petitioner failed to file its 2009 and 2010 returns by the terminal date established by section 882(c)(2), namely, the date on which the Commissioner exercised his authority under section 6020(b) to prepare returns for it. Petitioner is thus entitled to no deductions or credits for 2009 and 2010 under the statute, without reference to the regulations. We have no need to address the validity of the regulatory filing deadline here for the same reason that we had no need to address it in <u>Espinosa</u>, 107 T.C. at 158: "Under the factual circumstances here the regulation confers no additional rights on petitioner, and even if we were to hold some portion of this regulation invalid, petitioner would not prevail under our analysis of * * * [the statute] and the relevant case law."

C.     Petitioner's Entitlement to Deductions Under the Treaty

Having concluded that petitioner for 2009 and 2010 is entitled to no deductions under the Code, we consider next whether the Treaty compels a different outcome.  Petitioner notes that "none of the terminal date cases involve[d] the application of any income tax treaty provisions."  Petitioner accordingly views this question as one "of first impression for the courts."

According to petitioner, "the Treaty expressly and unconditionally provides that Adams * * * shall be allowed deductions."  It contends that section 882(c)(2), if interpreted to deny it deductions, would violate two provisions of the Treaty-- the business profits article and the nondiscrimination article.  We find neither argument persuasive.[12]

1.     Treaty Background

After section 882(c)(2) was codified in its current form, the United States entered into many bilateral income tax treaties, including a 1975 treaty with the

_____

[12]Petitioner seeks to minimize its challenge to the statute by concentrating its firepower on the regulations.  Because we hold that sec. 882(c)(2) by itself, without reference to the regulations, disallows deductions for 2009 and 2010, we need not consider petitioner's Treaty-based arguments to the extent those arguments are directed specifically to the regulations.  Rather, we focus on petitioner's argument that the statute would violate the Treaty if the statute is interpreted (as we have interpreted it) to disallow deductions and credits on the facts involved here.

U.K. (1975 treaty).[13]  Article 7(1) of the 1975 treaty provided that a contracting state could tax business profits attributable to a "permanent establishment" in that contracting state, and article 7(3) provided for deduction of expenses incurred in operating that permanent establishment.  The 1975 treaty also contained a nondiscrimination article aimed at preventing a contracting state from imposing on nonresidents a more burdensome tax.

Before the United States ratified the 1975 treaty, Treasury published a technical explanation of the treaty provisions.  Treasury submitted this document to the Senate and thereafter made it publicly available.  In the technical explanation Treasury stated that, under the 1975 treaty, neither contracting state was "obligated to carry out measures which are at variance with its laws or the administrative practice with respect to the collection of its own taxes."  See Treasury Department Technical Explanation of the 1975 Treaty (1975 Technical Explanation), art. 26, Tax Treaties (RIA) (Westlaw 2020), RIA TAXT 3579.

The current Treaty was signed on July 24, 2001, and entered into force on March 31, 2003.  The Treaty introduced some new provisions, e.g., covering pensions and limiting treaty benefits.  But the business profits and nondiscrimination

---

[13]Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital Gains, U.K.-U.S., Dec. 31, 1975, 31 U.S.T. 5668 (entered into force Apr. 25, 1980).

articles were virtually identical to their predecessors in the 1975 treaty. <u>Compare</u> Treaty arts. 7 and 25, <u>with</u> 1975 Treaty arts. 7 and 24.

As of March 2003 the law in the United States had been clear, for more than 60 years, that (1) a foreign corporation was entitled to deductions and credits only if it filed a U.S. income tax return, and (2) this return had to be filed before a "terminal date," defined as the date on which the IRS prepared a return for the foreign corporation. This represented the consistent position of Treasury and the Executive Branch and the unanimous consensus of the courts that had considered the question. There was no conflicting authority, and there was no authority of any kind for the proposition that foreign corporations resident in treaty countries were exempt from these rules.

Indeed, there was a reasonable body of authority indicating that foreign corporations resident in treaty countries were subject to these rules. The 1990 regulations explicitly stated that "[a] foreign corporation which has a [U.S.] permanent establishment, as defined in an income tax treaty between the United States and the foreign corporation's country of residence, * * * is subject to the filing deadlines." Sec. 1.882-4(a)(3)(v), Income Tax Regs. In <u>Espinosa</u>, 107 T.C. at 159, decided in 1996, the taxpayer urged that a filing deadline for foreign taxpayers violated the nondiscrimination article of the U.S.-Mexico tax treaty. While

finding no need to decide that question, we expressed skepticism as to whether any conflict existed between the treaty and the statute. See ibid.

Treasury addressed this question that same year in its technical explanation of the 1996 U.S. model income tax treaty. See Treasury Department Technical Explanation of the 1996 U.S. Model Income Tax Convention (1996 Model Explanation), art. 24, Tax Treaties (RIA) (Westlaw 2020), RIA TAXT 9048. Treasury explained:

> [I]t would not be a violation of the non-discrimination * * * [article] to require the foreign enterprise to provide information in a reasonable manner that may be different from the information requirements imposed on a resident enterprise, because information may not be as readily available to the Internal Revenue Service from a foreign as from a domestic enterprise. Similarly, it would not be a violation of * * * [the non-discrimination article] to impose penalties on persons who fail to comply with such a requirement (see, e.g., sections 874(a) and 882(c)(2)). * * * [Ibid.]

In 1999 the IRS Office of Chief Counsel opined that a filing deadline for foreign corporations was consistent with both the business profits and the non-discrimination articles of the 1975 treaty. See IRS Field Serv. Adv. 199944026 (Nov. 5, 1999).[14] The Office of Chief Counsel reasoned:

---

[14] Although IRS field service advice memoranda are nonprecedential, see SIH Partners LLLP v. Commissioner, 150 T.C. 28, 48 (2018), aff'd, 923 F.3d 296 (3d Cir. 2019), we may cite them to show the IRS' position, see Baker v. Commissioner, 122 T.C. 143, 167 n.25 (2004).

Treas. Reg. § 1.882-4 is a part of the administrative and procedural framework of the United States tax system within which the provisions of the treaty operate. The timeliness requirement concept embodied in * * * [the regulation] was already a part of the United States' tax administration system when the * * * [1975 treaty] was negotiated and entered into force, and the regulation merely provides Taxpayers with a bright-line application of this concept. Treaties are entered into with the underlying understanding that the provisions of the treaties are subject to the administrative and procedural framework needed for proper administration of each contracting state's tax system. [IRS Field Serv. Adv. 199944026, at 3.]

Treasury reaffirmed this interpretation of the nondiscrimination article in 2003, before the current Treaty was ratified. See Treasury Department Technical Explanation of the Treaty, art. 25, Tax Treaties (RIA) (Westlaw 2020), RIA TAXT 3527. Treasury again stated that imposing penalties under sections 874(a) and 882(c)(2) would not be a violation of the nondiscrimination article. Ibid.

The U.K. had access to all of these materials (except the last) while the current Treaty was being negotiated. The U.K. did not object to the U.S. view or express any intention that the Treaty should override section 882(c)(2) or the regulations interpreting it. The U.K. Department of Inland Revenue[15] did not supply a comprehensive technical explanation of the Treaty. However, it did agree with Treasury's position that the Treaty would not require a contracting state "to carry

---

[15]In 2005 the Department of Inland Revenue merged into Her Majesty's Revenue and Customs.

out administrative measures at variance with its existing practice." Inland Revenue Tax Bulletin, UK/US Double Taxation Agreement (2003 U.K. Bulletin) 16 (April 2003), http://publications.ruchelaw.com/pdfs/uk_treaty_explain.pdf (last visited Dec. 7, 2020).

> 2.    Analysis

Where the Code and a treaty pertain to the same subject matter but manifest an irreconcilable conflict, "the last expression of the sovereign will * * * control." Chae Chan Ping v. United States, 130 U.S. 581, 600 (1889). "However, if there is no conflict between the two, then the Code and the treaty should be read harmoniously, to give effect to each." Pekar v. Commissioner, 113 T.C. 158, 161 (1999); see sec. 7852(d)(1) ("For purposes of determining the relationship between a provision of a treaty and any [U.S.] law * * * , neither the treaty nor the law shall have preferential status by reason of its being a treaty or law.").

To "carry out the process of harmonization," courts "construe earlier and later provisions in a way that is consistent with the intent of each and that results in an absence of conflict between the two." S. Rept. No. 100-445, at 317 (1988), 1988 U.S.C.C.A.N. 4515, 4828. A conflict is found only where there is "a clear repugnancy" between the statute and the treaty. Georgia v. Pa. R.R. Co., 324 U.S. 439, 457 (1945). Thus, "a later treaty will not be regarded as repealing an earlier

statute by implication unless the two are absolutely incompatible and the statute cannot be enforced without antagonizing the treaty." Johnson v. Browne, 205 U.S. 309, 321 (1907). "If both can exist the repeal by implication will not be adjudged." Ibid.

Courts conducting this inquiry have the "responsibility to read the treaty in a manner 'consistent with the shared expectations of the contracting parties.'" Olympic Airways v. Husain, 540 U.S. 644, 650 (2004) (quoting Air France v. Saks, 470 U.S. 392, 399 (1985)). To that end we must examine "sources illuminating the 'shared expectations of the contracting parties,' such as 'the negotiating and drafting history' and 'the postratification understanding of the contracting parties.'" Eshel v. Commissioner, 831 F.3d 512, 520 (D.C. Cir. 2016) (quoting Zicherman v. Korean Air Lines Co., 516 U.S. 217, 223, 226 (1996)), rev'g 142 T.C. 197 (2014). We may also consult the interpretation of a treaty provision adopted by the relevant Government agency. While not dispositive, the agency's interpretation "is entitled to great weight." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184-185 (1982) (citing Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)).

### a. Business Profits Article

Petitioner first contends that the business profits article of the Treaty mandates that it be allowed deductions notwithstanding any contrary provision of U.S. law. That article provides in pertinent part: "In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses that are incurred for the purposes of the permanent establishment." Treaty art. 7(3). Because this article states that deductions "shall be allowed," petitioner asserts that the Treaty dictates the allowance of expense deductions.

Petitioner misapprehends the meaning of the phrase "shall be allowed" in this context. This phrase appears regularly in the Code, and petitioner cites no instance where the phrase means "must be allowed no matter what." Rather, this phrase typically means "shall be allowed so long as certain conditions are met."

Section 162(a), for example, provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." But taxpayers do not have an absolute entitlement to deduct all business-related expenses they incur. Numerous regulations limit the reach of section 162. See, e.g., sec. 1.162-2(e), Income Tax Regs. (disallowing deductions for commuting expenses); sec. 1.162-9, Income Tax Regs. (disallowing deductions for certain employment bonuses). Taxpayers must also substantiate

their deductions by maintaining adequate business records. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. There is no repugnancy between section 162(a) and these limiting conditions because they work together harmoniously. See Weiszmann v. Commissioner, 52 T.C. 1106, 1111 (1969) (holding that regulation limiting deductibility of education expenses does not conflict with section 162(a)), aff'd per curiam, 443 F.2d 29 (9th Cir. 1971).

Article 7(3) of the Treaty specifies the universe of deductions that are allowable to a foreign corporation--namely, "expenses that are incurred for the purposes of the permanent establishment." But this does not mean that a foreign corporation must be allowed to deduct any and all expenses that it incurs for the purposes of the permanent establishment. Section 162(c), for example, bars deductions for illegal bribes, kickbacks, and similar payments. Section 162(e) bars deductions for most lobbying and political campaign expenditures. Section 162(f) bars deductions for fines and penalties. And section 162(m) bars deductions for "Excessive Employee Remuneration."

These restrictions constitute substantive conditions limiting the deductibility of business expenses. Petitioner does not dispute that these substantive conditions permissibly limit its entitlement to deductions. And that is so despite the provi-

sion of article 7(3) that "there shall be allowed as deductions expenses that are incurred for the purposes of the permanent establishment."

Section 882(c)(2), in conjunction with other Code provisions, sets forth administrative and procedural conditions limiting the deductibility of business expenses. As relevant here, a foreign corporation is entitled to such deductions only if it (1) files a return and (2) files that return before the IRS has prepared and subscribed a return for it. Petitioner does not contend that the first condition is inconsistent with article 7(3), and it has not explained why the second condition should be impermissible if the first is not.

More generally, petitioner has not explained why article 7(3), which permits substantive conditions that limit business expense deductions, should be interpreted to bar administrative and procedural conditions that do so. Indeed, both the United States and the U.K. have recognized that each country may apply the administrative practices necessary to collect its revenue. Treasury stated that neither contracting state was obligated by the 1975 treaty "to carry out measures which are at variance with its laws or the administrative practice with respect to the collection of its own taxes." See 1975 Technical Explanation, art. 26. And U.K. tax authorities agreed that the current Treaty does not require a contracting

state "to carry out administrative measures at variance with its existing practice." 2003 U.K. Bulletin 16.

In short, there is no "clear repugnancy" between section 882(c)(2) and the Treaty. Pa. R.R. Co., 324 U.S. at 457. The statute does not prevent a U.K. corporation from being "allowed as deductions expenses that are incurred for the purposes of the permanent establishment." Treaty art. 7(3). Rather, section 882(c)(2) simply specifies the administrative steps that a U.K. taxpayer must take in order to report (and ultimately obtain) such deductions: It must (1) file a U.S. tax return and (2) file that return before the IRS prepares a return for it. These administrative requirements are not "absolutely incompatible" with the business profits article of the Treaty. Browne, 205 U.S. at 321. We accordingly conclude that the statute and the Treaty can "be read harmoniously, to give effect to each." Pekar, 113 T.C. at 161, 162-164 (holding that the alternative minimum tax credit limitation in section 59(a) does not conflict with a treaty's double taxation prohibition); Kappus v. Commissioner, T.C. Memo. 2002-36 (same), aff'd, 337 F.3d 1053 (D.C. Cir. 2003).

Petitioner errs in relying on Nat'l Westminster Bank, PLC v. United States, 512 F.3d 1347 (Fed. Cir. 2008). The taxpayer there was a U.K. bank that did business in the United States through a branch. Id. at 1349. Under article 7(2) of

the 1975 treaty, the U.S. branch was to be attributed the profits "it might be expected to make <u>if it were a distinct and separate enterprise</u> * * * <u>dealing wholly independently</u>" with the rest of the U.K. enterprise. <u>Id.</u> at 1350. Invoking a regulation, the IRS disregarded the U.S. branch's interest expense that accrued on interbranch loans. <u>Id.</u> at 1349, 1351. The Federal Circuit held that this action violated the 1975 treaty: Article 7(2) required that the U.S. branch's profits be determined as if it were a distinct entity unrelated to its home office and affiliates, whereas the IRS sought to tax the branch as an undifferentiated part of them. <u>Id.</u> at 1354-1355.

In <u>National Westminster</u> the regulation and the treaty were "absolutely incompatible," <u>see</u> <u>Browne</u>, 205 U.S. at 321, because they required contradictory tax treatment. Section 882(c)(2), by contrast, exists harmoniously with article 7(3) of the Treaty because U.K. corporations can deduct business expenses while also complying with the statute (i.e., by filing a return and by filing that return before the IRS prepares a return for it). Because there is no "clear repugnancy" between section 882(c)(2) and the Treaty, we must construe them as harmonious. <u>See</u> <u>Pa. R.R. Co.</u>, 324 U.S. at 457; <u>Xerox Corp. v. United States</u>, 41 F.3d 647, 658 (Fed. Cir. 1994) ("[U]nless it is impossible to do so, treaty and law must stand together in harmony.").

b.     Nondiscrimination Article

Petitioner next contends that section 882(c)(2) conflicts with article 25 of the Treaty, which addresses nondiscrimination.  Article 25 provides in relevant part:

> 1.  Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, particularly with respect to taxation on worldwide income, are or may be subjected.
>
> 2.  The taxation on a permanent establishment that an enterprise of a Contracting State has in the other Contracting State shall not be less favourably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities.

Under article 25(1) petitioner must show that section 882(c)(2) subjects foreign corporations (as compared to similarly situated U.S. corporations) to "more burdensome * * * taxation" or to more burdensome requirements "connected therewith."  Petitioner does not contend that the statute subjects it to "more burdensome taxation."  But it urges that section 882(c)(2) subjects it to more burdensome "requirements connected * * * with" taxation because U.S. companies do not forfeit all deductions if they neglect to file returns by an "arbitrary deadline."

Domestic corporations generally have 3½ months after the close of the tax year to submit returns before the IRS determines additions to tax. See secs. 6072(a), 6651(a)(1). Foreign corporations have a great deal more time to submit returns before the IRS disallows deductions and credits. Under the regulation that petitioner challenges, foreign corporations have 23½ months after the close of their tax year to file returns before section 882(c)(2) applies. See sec. 6072(c); sec. 1.882-4(a)(3)(i), Income Tax Regs. Under the statute's "terminal date" principle the filing period may be considerably longer. In this case petitioner had 51 months after the close of its 2009 tax year, and 39 months after the close of its 2010 tax year, to file returns before the IRS exercised its authority under section 6020(b).

Foreign corporations, moreover, may preserve their rights to deductions and credits by filing protective returns reporting zero income and deductions. See sec. 1.882-4(a)(3)(vi), Income Tax Regs. That is what petitioner did in 2017, more than six years after the close of its 2009 and 2010 tax years. Petitioner does not contend that filing those (essentially blank) returns was particularly onerous. It is hard to see how a requirement that a foreign corporation file a protective return within 23½ months of the close of its tax year is "more burdensome" than the filing requirements imposed on domestic corporations.

In support of its position petitioner cites the 2000 model income tax treaty put forth by the Organisation for Economic Cooperation and Development (OECD), an intergovernmental organization whose members include the United States and the U.K.  The OECD's commentary on that model treaty stated that a member country should not subject foreign corporations to more onerous "formalities" with respect to "returns, payment, [or] prescribed times."  OECD Committee on Fiscal Affairs, Model Tax Convention on Income and on Capital 237 (2000).  But section 882(c)(2) does not subject foreign corporations to more onerous formalities with respect to "returns," because they can preserve their claims to deductions and credits by filing merely protective returns.  And the statute does not subject them to more onerous formalities with respect to "prescribed times," because they have 20 months longer to file their returns than U.S. corporations.

Even if section 882(c)(2) were thought to impose more burdensome requirements on foreign corporations, such treatment would be problematic only if the requirements were more onerous than those to which U.S. corporations "in the same circumstances" are subjected.  Treaty art. 25(1).  Foreign corporations are not "in the same circumstances" as domestic corporations with respect to the filing of tax returns.

Congress enacted section 882(c)(2) to ensure that foreign corporations comply with the internal revenue laws. Predicating a foreign corporation's entitlement to deductions and credits on the filing of a return is justified in the light of the administrative difficulties the IRS faces. The Fourth Circuit described this situation as "pregnant with possibilities of tax evasion." Blenheim Co., 125 F.2d at 909. "[U]nless a foreign corporation is induced voluntarily to advise the Commissioner of all of its income attributable to sources within the United States * * *, the Commissioner may never learn even of the corporation's existence." Ibid.

Allowing a foreign taxpayer an endless period to file a return, moreover, would enable it to game the system. If a foreign taxpayer could "wait and see what information the Commissioner puts on a substitute return before the taxpayer has to file a return of his own," Espinosa, 107 T.C. at 157, the foreign taxpayer could elect to report its actual gross income or the income the IRS alleged, whichever amount was less. The foreign taxpayer would thus enjoy a one-way street in its favor. That outcome "would put a premium on tax evasion and would reduce the administration of the tax laws to mere idle activity." Blenheim Co., 125 F.2d at 912. Congress' enactment of an administrative provision to prevent that result is not "discriminatory."

Petitioner urges us to find that section 882(c)(2) violates the Treaty simply because it treats domestic and foreign taxpayers differently. But Congress has enacted many provisions that do this. Foreign corporations engaged in U.S. business are required to provide the IRS with specified categories of information. Sec. 6038C(a). Foreign corporations are subject to special rules regarding enforcement of IRS requests for records. Id. subsec. (d). Foreign persons holding direct investments in U.S. real property are required to file detailed information returns. Sec. 6039C. Such administrative provisions "reflect[] the different circumstances of foreign-owned and domestic-owned businesses." See H.R. Rept. No. 101-247, at 1249 (1989), 1989 U.S.C.C.A.N. 1906, 2719. Section 882(c)(2) and its predecessors resemble these provisions by imposing special administrative requirements on foreign taxpayers. Both the United States and the U.K. have recognized that the Treaty does not require a contracting state "to carry out administrative measures at variance with its existing practice." 2003 U.K. Bulletin 16; see 1975 Technical Explanation, art. 26.

Indeed, wholly apart from any timing requirement, section 882(c)(2) differentiates between foreign and U.S. corporations by requiring the former, as a condition of receiving deductions, to file "a true and accurate return." U.S. taxpayers need not file a return, much less a "true and accurate return," in order to be entitled

to deductions. After the IRS subscribes a return for a domestic taxpayer, the taxpayer has the opportunity to substantiate deductions during an IRS examination or during litigation in this Court.[16]

Petitioner does not contend that section 882(c)(2) discriminates against foreign corporations, in violation of article 25(1), by requiring them to file U.S. tax returns as a condition of receiving deductions. But it is a commonplace of U.S. tax law that returns must generally be filed by a certain time. If the statute does not discriminate against foreign taxpayers by requiring them to file returns, it is hard to see how it discriminates against them by establishing a date by which their returns must be filed.

Petitioner likewise errs in relying on article 25(2) of the Treaty, which provides that U.S. taxation on a U.K. company "shall not be less favourably levied * * * than the taxation levied on [U.S.] enterprises * * * carrying on the same activities." Petitioner asserts that section 882(c)(2) "impose[s] an entirely different method of taxation" on foreign corporations, but that assertion is simply untrue. Foreign corporations with effectively connected income are entitled to the same

---

[16]See, e.g., Sham v. Commissioner, T.C. Memo. 2020-119 (permitting taxpayer to attempt to substantiate deductions not included on the SFR); Tabe v. Commissioner, T.C. Memo. 2019-149 (permitting taxpayer to produce evidence at trial disproving information included on the SFR); Rodriguez v. Commissioner, T.C. Memo. 2009-22 (same).

business expense deductions as domestic taxpayers.  See sec. 1.882-4(a)(1), Income Tax Regs.  All petitioner needed to do to claim these deductions was to file a return by the deadline.

The nondiscrimination article of the Treaty is designed to ensure that enterprises of both contracting states are on a level playing field with respect to taxation.  See generally Sumitomo Shoji Am., Inc., 457 U.S. at 187-188 (noting that commercial treaties are designed to afford foreigners "the right to conduct business on an equal basis without suffering discrimination").  Petitioner and its domestic counterparts were on a level playing field with respect to how their U.S. income tax liabilities would be determined.  In urging that section 882(c)(2) "impose[s] an entirely different method of taxation," petitioner is complaining that the denial of deductions results in its being taxed on the basis of gross (rather than net) income.  But the statute does not impose this method of taxation on petitioner: It was entirely within petitioner's control whether it would be taxed on a gross or a net basis for 2009 and 2010, as it was for 2011.  Petitioner simply had to follow the administrative requirements of U.S. law with respect to how its deductions needed to be claimed.

Petitioner cites nothing from the Treaty's "negotiating and drafting history," Zicherman, 516 U.S. at 226, to suggest that either contracting party viewed

article 25 as overriding section 882(c)(2).[17]  And there is considerable evidence pointing in the opposite direction.  In 1996 Treasury published a model income tax treaty, which "essentially serve[d] as the United States's opening offer in treaty negotiations."  Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates & Gifts, para. 65.1, at *6 (Westlaw 2020), FTXIEG.  The model contained a nondiscrimination article nearly identical to the nondiscrimination article in the current Treaty.

Treasury's 1996 Model Explanation stated that it would not violate the nondiscrimination article to require a foreign taxpayer "to provide information * * * that may be different from the information requirements imposed on a resident enterprise" or to "impose penalties on persons who fail to comply with such a requirement," e.g., under "sections 874(a) and 882(c)(2)."  1996 Model Explanation, art. 24.  Treasury noted that different requirements were justified "because information may not be as readily available to the * * * [IRS] from a foreign as from a domestic enterprise."  Ibid.

_____

[17]Petitioner refers in passing to an "Explanatory Memorandum" prepared by U.K. tax authorities, which states that U.K. tax treaties generally "follow the approach adopted" by the OECD.  There is no indication that this document was prepared in connection with the U.S.-U.K. Treaty.  In any event, the document does not help petitioner because sec. 882(c)(2) does not contravene the OECD's approach.  See supra p. 56.

During ratification hearings in 2003 the Joint Committee on Taxation stated that the nondiscrimination article of the current Treaty "is similar to the non-discrimination article in the U.S. model." Staff of J. Comm. on Taxation, Explanation of Proposed Income Tax Treaty Between the United States and the United Kingdom 63 (J. Comm. Print 2003). The Joint Committee described a few areas where the U.K. had requested changes, but the U.S. position on section 882(c)(2) was not one of them. See ibid. This suggests that the U.K. did not disagree with Treasury's view. See Samann v. Commissioner, 313 F.2d 461, 463 (4th Cir. 1963) (holding that a treaty partner acquiesced to an interpretation by not objecting to it), aff'g 36 T.C. 1011 (1961); Simenon v. Commissioner, 44 T.C. 820, 840 (1965) (holding that a treaty partner had acquiesced by not objecting to an interpretation with which it had "long been acquainted"). If the U.K. intended the Treaty to override an administrative practice that had existed in the United States since the 1930s, it is reasonable to assume that it would have made this point explicitly. See Cook v. United States, 288 U.S. 102, 120 (1933) (stating that a treaty or a statute will not override the other "unless such purpose * * * has been clearly expressed").

"While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with negotiation and enforce-

ment is given great weight." Kolovrat, 366 U.S. at 194; see Sumitomo Shoji Am., Inc., 457 U.S. at 184-185 (noting that an agency's interpretation, while not dispositive, "is entitled to great weight"). We give considerable weight here to the interpretations clearly expressed by Treasury and the IRS. Treasury has repeatedly stated that section 882(c)(2) does not violate the nondiscrimination article either of the Treaty or of the U.S. model treaty. See supra pp. 45-46. The IRS similarly opined that section 882(c)(2) and the regulations interpreting it did not violate the nondiscrimination article of the 1975 treaty, reasoning that these provisions

> do[] not result in a different net tax result because as long as the foreign corporation complies with its administrative and procedural requirements, the net tax result for the foreign corporation will be the same as that of a U.S. corporation. Moreover, there is no "clear and manifest" intent on the part of Congress that the non-discrimination Article of the * * * [1975 treaty] override I.R.C. § 882(c). * * * [Field Serv. Adv. 199944026, at 16.]

Finally, it is notable that the United States has executed tax treaties with more than 60 countries, including this Nation's major trading partners. See Internal Revenue Manual pt. 21.8.4.4.3(3) (Apr. 3, 2012). Most of these treaties contain a nondiscrimination article virtually identical to that involved here.[18] If all

---

[18]See, e.g., Agreement for the Avoidance of Double Taxation and the Prevention of Tax Evasion with Respect to Taxes on Income, China-U.S., Apr. 30, 1984, T.I.A.S. No. 12,065 (entered into force Jan. 1, 1987); Convention for the Avoidance of Double Taxation with Respect to Taxes on Income and the Prevtion

(continued...)

of these treaties override section 882(c)(2), a statute that has existed essentially unchanged for 92 years would become largely meaningless.  We have no doubt that Congress and Treasury would regard this as an absurd result, and there is no evidence that British tax authorities would feel differently.

In consideration of the foregoing,

<u>An order will be issued denying petitioner's motion for partial summary judgment and granting respondent's cross-motion</u>.

---

[18](...continued)
of Fraud or Fiscal Evasion, Italy-U.S., Apr. 17, 1984, T.I.A.S. No. 11,064 (entered into force Dec. 30, 1985); Convention with Respect to Taxes on Income and on Capital, Can.-U.S., Sept. 26, 1980, T.I.A.S. No. 11,087 (entered into force Aug. 16, 1984).